UNITED STATES of America, Appellee,

v.

**James E. BARRINGTON, Appellant.**

**No. 80–5201.**

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1981.

Decided Oct. 21, 1981.

Rehearing Denied Jan. 13, 1982.

---

Joseph R. Lassiter, Jr., Norfolk, Va. (Hofheimer, Nusbaum, McPhaul & Brenner, Norfolk, Va., on brief), for appellant.

Larry W. Shelton, Asst. U. S. Atty., Norfolk, Va. (Justin W. Williams, U. S. Atty., Norfolk, Va., Jacob Lutz, Third Year Law Student on brief), for appellee.

Before BUTZNER and MURNAGHAN, Circuit Judges, and RAMSEY *, District Judge.

MURNAGHAN, Circuit Judge:

■ As was all Gaul, the initial indictment, a superseding indictment and a superseding criminal information were in every case divided into three parts. In each there were three counts charging fraudulent misrepresentation, Count I as to the Aid for Dependent Children ("AFDC") program, Count II as to the foodstamps program, and Count III as to the Medicaid program. The initial indictment was filed July 14, 1980, the superseding indictment on August 25, 1980, and the superseding criminal information on September 4, 1980.

The superseding indictment, like the initial indictment, charged, in each count, a violation of the same statute, 18 U.S.C. § 287. (The superseding indictment added references to the aiding and abetting statute, 18 U.S.C. § 2(b).) Both indictments repeated in each count the allegation that "he then well knew the claims to be false and fraudulent in that he was both employed and received workmen's compensation during this period." "This period" in Counts I and II of each indictment was April 1, 1977 until February 28, 1978, and, in Count III, April 1, 1977 until January 31, 1978.

The initial indictment charged that the defendant "caused to be presented" claims which were false and fraudulent to the United States Department of Agriculture in Count II, and to the United States Department of Health, Education and Welfare in Counts I and III. The superseding indictment amended the charges so that the defendant allegedly "did present" claims that were false and fraudulent to the same United States departments "through the Norfolk Division of Social Services." Otherwise, the indictment and the superseding indictment did not differ.

The criminal information's three counts charged violations of 42 U.S.C. §§ 601 and 1307(a) as to AFDC, 7 U.S.C. §§ 2011 and 2024(b) as to foodstamps, and 42 U.S.C. §§ 1396a and 1396h(a)(3) as to Medicaid. However, they concerned precisely the same activities as dealt with in the two indictments, being alike as to the time frame, and charging in each count guilty knowledge "that he received income from his employment as well as workmen compensation benefits", or that "he well knew that he was ineligible . . . due to his employment and his receipt of workmen's compensation," or that he "failed to disclose . . . the fact that he had become employed as well as his receipt of workmen's compensation benefits. . . ."

Count I charged misrepresentations made to the Secretary of HEW through the Norfolk, Virginia Division of Social Services (a state agency). Count II charged acquisition of foodstamps through the same state agency. Count III asserted fraudulent nondisclosure to the state agency of the receipt of

* The Honorable Norman P. Ramsey, United States District Judge for the District of Maryland, sitting by designation.

wages and workmen's compensation benefits.

On April 1, 1976, the defendant Barrington in the course of applying for several welfare benefits from the Norfolk, Virginia Division of Social Services, filed a true and correct statement as to his financial condition. The single, consolidated statement qualified him for benefits under all three programs. When he was approved on June 2, 1976 (retroactive to April 1, 1976) as eligible for the benefits, the April 1, 1976 statement was still correct.

Under the regulations, Barrington had a duty to report promptly any change in employment or receipt of additional income. Subsequently, between March 26, 1977 and February 28, 1978, Barrington earned approximately $3851. In the period April, 1977 until or through February, 1978, Barrington also received, without notifying the Virginia Social Services agency, three workmen's compensation benefits, aggregating $2,793.60. Although aware of his responsibility Barrington failed to report the wages or the workmen's compensation payments. He continued to benefit under the three welfare programs up through February, 1978.

The initial indictment of July 14, 1980 charged three felonies. The defendant pleaded not guilty.

Then there came the superseding indictment of August 25, 1980, followed by the superseding criminal information filed September 4, 1980, to which, as part of a plea bargain, the defendant pleaded guilty. The charges were misdemeanors:

Count I, 42 U.S.C. § 1307(a) (Welfare Fraud), maximum penalty one year and $1,000;

Count II, 7 U.S.C. § 2024(b) (Foodstamps Violations), maximum penalty one year and $1,000;

Count III, 42 U.S.C. § 1396h(a)(3) (Medical Assistance Grants Penalties), maximum penalty one year and $10,000.

On October 6, 1980, pursuant to the guilty pleas, the district court sentenced Barrington to one year under each count, to be served consecutively, i. e., a total imprisonment of 3 years. A fine aggregating $7500 ($1,000 on Count I, $1,000 on Count II, and $5,500 on Count III) was also imposed. All but 180 days of the imprisonment were suspended, but a probation of 4 years and 185 days (amounting, with the 180 days to be served, to 5 years) was imposed on condition that the defendant make monthly payments of $150 each until the $7500 fine has been satisfied. Failure to maintain payment of the fine in accordance with the monthly terms prescribed would lead to revocation of probation and reincarceration for the suspended period.

Counsel for defendant argues that essentially there was but a single offense, or, at any rate, what defendant did was subject to but a single punishment. James Barrington, he points out, simply did not go to the Norfolk, Virginia Division of Social Services and enlighten that agency about changes in his financial status. Counsel emphasizes that bureaucratically, administration of the plans under the several benefit programs had been assigned to the Commonwealth of Virginia, and that it, or its surrogate, the Norfolk Division of Social Services, in conformity with those plans (for which federal approval is required[1]) had unified the application form so that someone such as Barrington was called upon to file but a single statement, rather than three separate statements, one under each of the three federal statutes.[2]

---

1. *See* 42 U.S.C. § 601, 7 U.S.C. § 2020, and 42 U.S.C. § 1396.

2. Such a composite approach was not simply the product of the policies of the Commonwealth of Virginia. The sensible red-tape reducing attitude was also displayed by the Federal Congress. *See* House Conference Report No. 95–599, 95th Cong. 1st Sess., *reprinted in* 2 U.S.Code & Admin.News, 2445, 2499 (1977):

The *Conference* substitute adopts (1) the *Senate* provision requiring a single interview for determining eligibility for the food stamp and Aid to Families with Dependent Children (AFDC) programs, (2) the *House* amendment requiring that supplemental security income (SSI) households be allowed to apply for food stamps by executing a simplified affidavit at social security offices and be certified utilizing information in the SSI files, (3) the *House*

It is undisputed from the record that, from June 2, 1976 until March 26, 1977, receipt of AFDC benefits, foodstamps and Medicaid by the defendant was altogether lawful. Such receipts became unlawful upon, and solely by reason of, Barrington's post-March 26, 1977 wages and workmen's compensation benefits. When Barrington pleaded guilty, the assistant United States Attorney stated: "At the time he applied, he was eligible for these benefits. . . . And he became ineligible later on and his failure to report changed his circumstances."

The government contends, on the other hand, that there were three separate offenses, susceptible of three distinct criminal penalties. The prosecutor relied for that proposition primarily on the decision in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), recently reaffirmed in *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981):

> amendment requiring that public assistance or general assistance households have their application for participation in the food stamp program contained in the public or general assistance application form, and (4) the *House* amendment requiring that certifications of new public assistance or general assistance recipient households or households who recently lost their benefits under those programs will be based on information in their case file to the extent verification is available. The *Conferees* understand that a single interview may not be possible where the agency that administers the AFDC program is not the same agency that administers the food stamp program.
>
> *Cf.* House Conf. Report No. 96–957 on the Food Stamp Act, 96th Cong. 2d Sess., *reprinted in* 3 U.S.Code & Admin.News 1057, 1061 (1980):
>
> (F) The *House* amendment requires the Secretary to consult with the Secretary of Health, Education, and Welfare in implementing the periodic reporting requirements and, whenever feasible, households that receive income under the aid for families with dependent children (AFDC) program and that are required to file comparable reports under that program would be provided the opportunity to file reports at the same time for the purposes of both programs.
>
> The *Senate* bill contains no comparable provision.
>
> The *Conference* substitute adopts the *House* provision.

Each of the offenses created requires proof of a different element. The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182.

The statement constitutes a "rule of statutory construction." *Albernaz v. United States, supra,* 450 U.S. at 340, 101 S.Ct. at 1143; *Whalen v. United States,* 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980). Only if the answer proves to be that the defendant committed separate crimes for which Congress intended that he should be subjected to separate pyramided sentences [3] does any issue of double jeopardy in the constitutional sense under the Fifth Amendment arise. Addressing the question of statutory construction, the first thing to note is that obviously a variety of

3. There are situations where, even though the *Blockburger* test has been satisfied, nevertheless, it may be possible, through other interpretational aids, to establish that multiple punishments were not intended by Congress. In *Albernaz*, it is stated:

> The *Blockburger* . . . rule should not be controlling where, for example, there is a clear indication, of contrary legislative intent. 450 U.S. at 340, 101 S.Ct. at 1143.

For example, in *Heflin v. United States*, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), the Court decided that Congress did not intend to pyramid punishment for someone holding up a bank, once for robbing the bank, and again for receiving the fruits of the robbery. *See Baugh v. United States*, 540 F.2d 1245, 1246 (4th Cir. 1976). We assume, however, that such an approach to ascertainment of congressional intent with respect to the crimes here at issue. The *Heflin* doctrine would make multiple sentencing always incorrect whenever there were counts charging violation of two or more of the welfare statutes. We limit our consideration to the particular situation of the particular case, and find that pyramided sentencing is barred as a matter of congressional intent. However, we do not mean to imply that separate sentences could not, in other circumstances, involving different considerations, be imposed under all three statutes.

factual situations can be presented calling for variation in application of the *Blockburger* formula. At one extreme, we may have the situation where the defendant's activities are made up of a number of acts. He may have purchased narcotics in a foreign country and smuggled them into the United States, thereafter distributing them to a variety of individuals. Obviously both the crimes of importation and of distribution have been separately committed. To prove importation, the government could stop once the accused had passed through customs and prior to any distribution. Correspondingly, to prove distribution, the government could concentrate exclusively on activities commencing only after the defendant had landed. Thus, when multiple acts are involved and they are susceptible of such disentanglement, it is customarily relatively easy for the prosecution to satisfy the *Blockburger* requirement that, to make out multiple crimes, there need only be a showing that each provision requires proof of a fact which the other does not.[4]

Similarly, the activities of an accused, rather than combined to form one continuing activity, as in the case of importation and distribution referred to above, may also partake of independent non-continuous aggregations of facts making out two or more distinct crimes. As demonstrated in *Blockburger* itself, a sale of drugs on one day may constitute one crime and a separate sale of other drugs on the next day will constitute a separate independent crime, even though the sales are made to the same person.

The opportunity was presented in the present case for the government to have pursued such a discontinuous approach. We have, of course, no occasion to decide,[5] but we can assume that the government could have successfully sought conviction and punishment for the fraudulent concealment of the first workmen's compensation benefit under one count, of the first wage payment under a second count, of the second workmen's compensation payment under a third count, etc. However, matters of this nature are determined not by what might have been done but by what, in fact, was done. *Cf. Sanabria v. United States*, 437 U.S. 54, 65–66, 98 S.Ct. 2170, 2179, 57 L.Ed.2d 43 (1978):

> Legal consequences ordinarily flow from what has actually happened, not from what a party might have done from the vantage of hindsight.... The precise manner in which an indictment is drawn cannot be ignored ....

Instead of proceeding in a fashion, by which each count was grounded on a discrete fraudulent nondisclosure, the government elected to support the claim of fraudulent concealment under each count as having triggered collectively all the undisclosed payments, workmen's compensation and wages together.[6] It thus was the conscious choice of the government, for the purposes of this case, to make all nondisclosures of

---

4. *E. g., Blockburger, supra* (sale of drugs not within the original stamped package is independent of a sale of drugs not in pursuance of a written order); *Albernaz, supra* (conspiracy to import marijuana is criminal whether or not there is a subsequent distribution; distribution is a crime even though the accused did not participate in the importation); *Ianelli v. United States*, 420 U.S. 770, 777–78, 95 S.Ct. 1284, 1289–90, 43 L.Ed.2d 616 (1975); *Harris v. United States*, 359 U.S. 19, 22, 79 S.Ct. 560, 563, 3 L.Ed.2d 597 (1959); *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *Albrecht v. United States*, 273 U.S. 1, 11, 47 S.Ct. 250, 253, 71 L.Ed. 505 (1927) ("One may obviously possess without selling; and one may sell and cause to be delivered a thing of which he has never had possession; or one may have possession and later sell, as appears

to have been done in this case."); *United States v. Garner*, 574 F.2d 1141, 1146–47 (4th Cir. 1978), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); *Baugh v. United States*, 540 F.2d 1245 (4th Cir. 1976).

5. *But see Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *In re Nielsen*, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889).

6. For example Count III in the criminal information stated that he "failed to disclose ... the fact that he had become employed as well as his receipt of workmen's compensation benefits...." Similar language appeared in the other two counts, as well as in each count of the indictment and of the superseding indictment.

wage payments and of workmen's compensation benefits a single fact.

The government did belatedly seek to argue that each failure to disclose upon receipt of a different payment constituted a separate crime.[7] However, the district court clearly made no separation of that kind. Instead, the district judge, in connection with acceptance of the guilty pleas, clearly followed the lead of whoever drafted the indictments and information, and tied all workmen's compensation and all wage receipts together for each of the three counts. With respect to Count I he said:

> You were employed and you did have income from your employment and that you were also receiving workmen's compensation benefits.

As to Count II his statement was:

> . . . you knew . . . that you were ineligible to receive . . . those food coupons due to the fact that you were employed and that you were receiving workmen's compensation.

His observations as to Count III read:

> . . . you thereafter became ineligible because you resumed employment and because you were in receipt of workmen's compensation benefits, but instead of telling the government that, that you continued to receive Medicaid benefits when you knew you weren't eligible for them. . . .

Similarly, in terms of what the government might have done, rather than what it in fact did, it might, looking at the statutory language alone, and disregarding the legislative history indicating a Congressional purpose favoring composite administration,[8] have administered the three welfare programs differently. Three separate statutes were involved, one for AFDC, one for foodstamps, and one for Medicaid. Nondisclosure to the administrator of each program could have been a different act so that each count could be deemed to have set

forth a distinct offense requiring proof of a fact which the other did not, and for which the government, consequently, was entitled to exact a separate punishment.

If, indeed, things had proceeded on the basis of prosecution for three separate fraudulent concealments, the person being kept in the dark being the administrator of AFDC, in one case, the administrator of the foodstamps program, in another case, and the Medicaid administrator in the third case, no doubt the argument would have been very strong. However, that is not how things happened.

Instead, the federal government, through its Virginia surrogate, had consolidated administration of the three programs in such a way that an applicant was required to make but one initial application for benefits. We, of course, in no way fault so forward looking a step calculated to cut down the red tape attendant upon the obtaining of benefits to which indigent persons are entitled. Nevertheless, it was not without consequences beyond the immediate ones of simplifying the paperwork. Barrington was fully eligible when he made his application in April, 1976 and also later in June, 1976, when he was approved and began to receive payments. He remained eligible and properly received benefits until April, 1977.

At that time, when he first received additional sums which might have eliminated or reduced his benefits, he had and knew he had a responsibility to inform the source of benefits. For him, of course, it was a source of benefits for he had made but one application. It takes no great resort to the principle of lenity to conclude that, in keeping quiet instead of 'fessing up, he reasonably understood that he was making but a single nondisclosure. It being the eminently more reasonable one, Congress, we believe, had the same understanding about anyone in the situation of Barrington. Had

---

7. The prosecutor stated at the time of entry of the guilty pleas:

> They might have originated out of one act— one initial act, but they didn't occur at the same time. So I believe the Court would be

within its province to sentence under each count.

8. *See* n.2 *supra.*

Barrington been required to trudge up the stairs of three different government office buildings and make three different applications for benefits, it would have been reasonable to require him to make three distinct disclosures of additional income. But having only one to make, the failure was a single not a multiple offense. The government began the process by which only one, rather than three, was required. It cannot change horses in midstream and argue that, going into the river on one steed, the defendant must, to comply with the law, emerge with three.

The government perceived some of the difficulties inherent in the composite application and composite disclosure requirement. The language of Count I under the AFDC statute and Count III under the Medicaid statute are, when parsed, essentially identical prohibitions of nondisclosure of eligibility-affecting receipts from other sources. Magnanimously the government, at oral argument, agreed to a treatment of Count I as, for that reason, having merged with the crimes for which sentencing was imposed under Counts II and III. The government's concession was limited to this particular case and so would have no precedential effect. However, a precedential effect bearing on multiple sentencing in a like set of circumstances is to be derived from our treatment of the separate and cumulative sentences under Counts II and III.

The government has sought to build on its concession as to Count I by pointing out that, while Count I and Count III proceed under statutes which may have similar language spelling out essentially identical crimes so that provisions each requiring proof of a fact which the other does not are unlikely, nevertheless, the situation under Count II is entirely different. Unlike Counts I and III, the statute under which Count II is framed is not cast in terms of fraudulent misrepresentation or concealment. Instead, it provides for punishment of "whoever knowingly uses ... acquires

... or possesses coupons or authorization cards in any manner not authorized by this Act...." The statute applicable to Count III seeks to punish fraudulent concealment or failure to disclose, with knowledge of an event affecting the continued right to Medicaid. Thus, contends the government, any identity of crime as between Counts I and III is by no means present insofar as Count II is concerned. However, obeying the admonition to treat things as they are and not as they might have been, we note that, in this particular case, the manner "not authorized by this Act" involved acquisition and resulting use or possession of foodstamps *as a consequence of fraudulent concealment.*

The government makes a might-have-been response. The crime under Count II, looking only to the statutory language, and not to the actual, factual circumstances it was drafted to cover, namely those of Barrington's case, could have proceeded under some quite different "manner not authorized by this Act." For example, the defendant might have stolen the foodstamps or purchased them unlawfully.

The government's argument loses sight of the total nature of the information's construct. As the matter has arisen before us, the count under 7 U.S.C. § 2024(b) has not been pressed independently. Instead, it has been coordinated with prosecutions under 42 U.S.C. § 1307(a) and 42 U.S.C. § 1396h(a)(3) in such a manner as to reveal the proceeding under 7 U.S.C. § 2024(b) as one exclusively concerned with fraudulent concealment as the only "manner not authorized by this Act," which was operative or of any concern to the government.[9]

Where the actual "manner not authorized by this Act" is indeed fraudulent concealment and not some other possible manner, the construction of the statute should be in terms of the actuality and not in terms of hypothetical but not genuine possibilities. That is the teaching of *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63

---

**9.** As the case has been presented to us, the holding in *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942) is the correct one to apply. We have the equivalent of a single statute and a single, if continuing, fraudulent misrepresentation. *See Bramblett v. United States,* 231 F.2d 489, 491 (D.C.Cir. 1956).

L.Ed.2d 715 (1980). There two crimes were charged, rape and felony murder. Felony murder could be made out with respect to a killing in the course of commission of six different crimes, one, but only one, of them being rape (the others being robbery, kidnapping, arson, etc.). The defendant was convicted both of a rape and of the killing of the victim. The Supreme Court refused to accept the argument that, applying *Blockburger*, there were two separate crimes for which separate penalties could be imposed because the statute could have involved other felonies besides rape:

> The Government contends that felony murder and rape are not the "same" offense under *Blockburger*, since the former offense does not in all cases require proof of a rape; that is, D.C.Code § 22–2401 (1973) proscribes the killing of another person in the course of committing rape *or* robbery *or* kidnapping *or* arson, etc. Where the offense to be proved does not include proof of a rape—for example, where the offense is a killing in the perpetration of a robbery—the offense is of course different from the offense of rape, and the Government is correct in believing that cumulative punishments for the felony murder and for a rape would be permitted under *Blockburger*. In the present case, however, proof of rape is a necessary element of proof of the felony murder, and we are unpersuaded that this case should be treated differently from other cases in which one criminal offense requires proof of every element of another offense.... To the extent that the Government's argument persuades us that the matter is not entirely free of doubt, the doubt must be resolved in favor of lenity.

*Whalen v. United States, supra*, 445 U.S. at 694, 100 S.Ct. at 1439.[10]

10. *Cf. Brown v. Ohio*, 432 U.S. 161, 167–68, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977) ("The prosecutor who has established joyriding need only prove the requisite intent in order to establish auto theft; the prosecutor who has established auto theft necessarily has established joyriding as well.").

Nor, of course, would it avail the government to argue that there are two offenses with each provision requiring proof of a fact which the other does not because each statute requires proof of a different governmental benefit, a different element of each offense. Count II, it is true requires proof of possession of foodstamps, which Count III does not. However, that consideration brings the *Blockburger* doctrine at most half of the way. A different element for *each* of the offenses is required. *Each* provision requires proof of a fact which the other does not. The additional element, while existing for Count II, has not been shown for Count III. For Count III the proof required is solely that of a false representation, a fact which is part and parcel of the Count II offense.

In such circumstances, we perceive no intent of Congress to make it a separate crime, subject to multiple penalties, purely because more than one type of benefit, simultaneously and for the same reason, became legally unavailable to Barrington because he concealed one truth. There is reinforcement for that conclusion in the consideration that there was but one application for benefits and but one agency to inform of a change in financial status, namely, the Norfolk, Virginia Division of Social Services.

All in all, the question is one of statutory construction: what was the congressional intent as to what punishment should be permitted when criminal activities breach more than one statutory scheme? Of course, there is no way to fathom a specific intent on the part of Congress. If it had had any specific idea on the subject, presumably it would have expressed it. Rather, it is intent in only the most general of senses: what would Congress have intended, if it had ever considered the matter? *See* Justice Frankfurter in *Bell v. United*

The prosecutor who has established acquisition or possession of foodstamps in any manner not authorized, relying on fraudulent concealment to establish unauthorized acts, necessarily has established fraudulent concealment under either of the other two statutes as well.

*States*, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955) speaking to a similar situation and alluding to the task imposed on the courts "of imputing to Congress an undeclared will."

In such cases, *Bell* held, "the ambiguity should be resolved in favor of lenity." "It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment." *Id.* *Bell* declined to permit more than a single punishment where the defendant was convicted under two counts for violation of the Mann Act. He had transported across state lines two different women, albeit on the same trip and in the same vehicle. The essence of the opinion is contained in its closing sentence:

> ... if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses ....

To like effect is *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978). Only a single sentence was permitted following conviction under two distinctly different statutes: the bank robbery statute, 18 U.S.C. §§ 2113(a) and (d) and the firearms statute, 18 U.S.C. § 924(c). The use of the firearms occurred in the course of the bank robberies. The Supreme Court proceeded on the assumption that the *Blockburger* test had been met, *i. e.*, that "each provision requires proof of a fact which the other does not," yet found that other indications of contrary Congressional intent outweighed the *Blockburger* indicia:

> ... to construe the statute to allow the additional sentence authorized by § 924(c) to be pyramided upon a sentence already enhanced under § 2113(d) would violate the established rule of construction that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."

435 U.S. at 14, 98 S.Ct. at 913.

*See also, Brown v. United States*, 623 F.2d 54, 57 (9th Cir. 1980) which applied "the rule of lenity", defined as follows:

A court may not impose consecutive sentences for a single transaction that violates more than one statutory provision or purpose unless Congress has clearly expressed its intent to make each violation within that single transaction a separate offense subject to separate punishment. ...

*Blockburger* provides, therefore, but one method for ascertaining Congressional intent. Thus, even were its test met in this case, it is, while useful, up to a point, not universal in its application. *Blockburger*, and many of the cases within its periphery, address simultaneous violations of several drug statutes. The concepts of mercy or lenity attach far more strongly to a case like Barrington's involving a welfare recipient, someone for whom the economics of life simply became overwhelming. Congress has expressed sympathy to those in Barrington's class in several ways, specifically by providing AFDC, foodstamp and Medicaid assistance programs.

When someone such as Barrington, qualifying for those three benefits, after legitimately receiving them for some time, fails to speak up on receipt of other modest sums, which would terminate or reduce his qualification, when the nondisclosure is treated as a single fact by the criminal information under which he is charged, and when, for reporting purposes, the three programs have been coalesced into one, we are satisfied that Congress intended Barrington's unitary silence to constitute the basis for but a single punishment.

Accordingly, we vacate the sentences under Counts I and II, leaving intact, however, Count III. Practically, the ultimate effect insofar as incarceration is concerned may be no different whether the sentences under Counts I and II were or were not left standing. If Barrington complies with his conditions of probation, the result will be the same. However, he is entitled, in case he should violate the conditions of probation, to have hanging over him no greater Damoclean sword of prospective incarceration than the law allows. Here, it is 185 days, not 2 years and 185 days. Further-

more, the aggregate fine becomes simply the fine under Count III of $5,500. The fines of $1,000 each under Counts I and II having been eliminated, the probation condition will be the payment of $5,500, not $7,500.

One additional observation may be appropriate. The order of the district court speaks unequivocably of return to prison for violation of probation should Barrington miss any of the required payments of $150 per month.[11] As phrased, the language would seem to call for invocation of the sanction of imprisonment for failure to make payments, however diligent Barrington's efforts may have been.[12] Obviously, he should not be imprisoned if he becomes unemployed through no fault of his own, or if illness or injury precludes his earning enough to make the payments. Revocation of probation for inability to pay the fine would offend the Constitution. *United States v. Santarpio*, 560 F.2d 448, 455–56 (1st Cir. 1977), *cert. denied, sub nom. Schepici v. United States*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977). The government, at oral argument, conceded that the order of the district court should be so interpreted. In light of that clarification, it is not necessary to remand for revision of the order of the district court in that respect.

*AFFIRMED IN PART AND VACATED AND REMANDED IN PART FOR REFORMATION OF THE SENTENCE IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THE OPINION.*

---

11. The judgment reads: "Further conditions of probation are that defendant must remain employed and pay $150 per month toward fines."

12. The trial court stated: "Upon your failure to remain employed, upon your failure to make your payments as required by this order here today, you will be brought back in, and if I find that you have failed to meet your terms of probation, I will revoke your probation and you will be required to serve the other two and a half years of your prison term.... One of those [probation] terms will be that you pay at least $150.00 a month on this fine...."