**UNITED STATES of America, Appellee,**

v.

**Edwin Paul WILSON, Appellant.**

**No. 83–5002.**

United States Court of Appeals, Fourth Circuit.

Argued June 10, 1983.

Decided Nov. 4, 1983.

Herald Price Fahringer, New York City, for appellant.

Theodore S. Greenberg, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief) and Kim E. Rosenfield (William C. Hendricks, III, Jo Ann Farrington, William Otis, Dept. of Justice, Washington, D.C., on brief), for appellee.

Before RUSSELL and MURNAGHAN, Circuit Judges, and BULLOCK, District Judge, United States District Court for the Middle District of North Carolina, sitting by designation.

DONALD RUSSELL, Circuit Judge:

Appellant Edwin P. Wilson was convicted, following a jury trial, of seven federal criminal offenses involving the export of a M–16 rifle and four revolvers. In summary, these offenses are: 1) conspiracy, under 18 U.S.C. § 371, to export firearms illegally in violation of 18 U.S.C. §§ 922(a)(3), 922(e), 924(b) and 22 U.S.C. § 2778 (Count 1); 2) export of firearms without a license, 22 U.S.C. § 2778(b)(2), (c) (Counts 2 and 6); 3) delivery of firearms to a common carrier for shipment in foreign commerce without written notice to the carrier, 18 U.S.C. § 922(e) (Counts 4 and 7); and 4) transport of firearms in foreign commerce with intent to commit a felony, i.e., the export of firearms without a license, 18 U.S.C. § 924(b) (Counts 5 and 8).[1] Wilson challenges these convictions on numerous grounds. We va-

cate the sentences imposed and remand for resentencing on the 18 U.S.C. § 924(b) and 22 U.S.C. § 2778 convictions, and otherwise affirm.

## I.

Edwin Wilson served in the Central Intelligence Agency between 1955 and 1970, and then worked with United States naval intelligence until 1975. After his resignation, he started his own firm and embarked upon commercial dealings with the government of Libya. By late 1978 or early 1979, Wilson began negotiating for the sale of weapons to the Libyans, and in 1979 he commenced a scheme to procure sample weapons through his employees. The government argued at trial that Wilson's motivation was the prospect of lucrative arms contracts with Libya, worth millions of dollars; Wilson maintains that his actions were intended to secure the confidence of the Libyans and enable him to obtain secret information for United States intelligence agencies. Wilson's employees were unable to acquire the desired weapons in Europe, and Wilson then turned to the United States, although he knew that he could not obtain the required export licenses.

In March of 1979, Wallace Klink, an employee of Wilson's in the United States, acting on Wilson's instructions bought four revolvers and turned them over to Reginald Slocombe, another Wilson associate. Slocombe concealed the handguns in a toolbox, and checked the toolbox on a flight from Dulles International Airport to London, England and Rotterdam, Holland. Ultimately Wilson's employees, following his instructions, delivered the weapons to a Libyan named Ezzidine Monseur in Bonn, West Germany.

In May of 1979, Wilson telephoned a close associate in the United States, Paul Cyr, and asked Cyr to obtain for him a sample M–16 automatic rifle, offering to pay $10,-000. Cyr had acquired a M–16 several

---

1. Appellant was acquitted on Count 3, unlicensed transport of firearms in interstate com-   merce, 18 U.S.C. § 922(a)(3).

years before while serving in the Army; the weapon had formerly been a display piece possessed by a General Anderson. Cyr gave the M–16 to Slocombe, who concealed it in a footlocker, and acting on Wilson's instructions, checked it on a flight from New York City to Amsterdam, Holland. On neither this nor the previous occasion had Slocombe given notice that he was transporting firearms to the carrier. In Amsterdam, Wilson personally took possession of the M–16, and from there it was placed on a chartered jet and flown to Libya.

Some three months later, the Libyan government entered into a contract with Wilson for 5000 M–16 rifles and other arms and ammunition. Wilson proved unable to perform on this contract.

## II.

The most serious issue presented by this appeal is Wilson's contention that his convictions under both 18 U.S.C.A. § 924(b) and 22 U.S.C.A. § 2778 are multiplicitous. 22 U.S.C.A. § 2778(a)(1) authorizes the President to control the import and export of designated defense articles and defense services. Among the regulated items are automatic and nonautomatic firearms. Section 2778(b)(2) prohibits unlicensed export or import of these items, while § 2778(c) authorizes imprisonment of up to two years and a maximum fine of $100,000 for willful violations.[2] 18 U.S.C.A. § 924(b) authorizes imprisonment of up to ten years and a maximum fine of $10,000 for anyone who ships, transports or receives a firearm or ammunition in interstate or foreign commerce "with intent to commit therewith" an offense punishable by imprisonment exceeding one year.[3] In this case, Wilson's § 2778 violations furnished the predicate felonies for his § 924(b) convictions. He received fifteen years' imprisonment on the § 924(b) counts, with four years' concurrent imprisonment and a $200,000 fine on the § 2778 counts. We believe that Congress did not intend § 2778 and § 924(b) offenses to be punished more severely in combination than either could be punished separately, absent any additional proof of wrongdoing. Indeed, imposing sentences under both statutes would violate the appellant's Fifth Amendment protection against double jeopardy.

Our starting point is the Supreme Court's double jeopardy analysis articulated in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which declares that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. Subsequent Supreme Court decisions have

---

2. The relevant provisions of 22 U.S.C.A. § 2778 read as follows:

(a)(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the import and export of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

(b)(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such import or export . . . .

(c) Any person who willfully violates any provision of this section . . . shall upon conviction be fined not more than $100,000 or imprisoned not more than two years, or both.

3. The full text of 18 U.S.C.A. § 924(b) reads as follows:

Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports or receives a firearm or any ammunition in interstate or foreign commerce shall be fined not more than $10,000, or imprisoned not more than ten years, or both.

made it clear that the crucial inquiry is whether proof of all statutory elements of either offense would automatically entail proof of all the elements of the other. *See Illinois v. Vitale,* 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980); *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975). Here, it is evident that proof of all the elements of § 2778 automatically proves a § 924(b) violation. The controlled defense articles under § 2778 include the firearms regulated by § 924(b), while export under § 2778 and transport in foreign commerce under § 924(b) are practical equivalents. Finally, we recognize that the term "willfully," the *mens rea* element of § 2778, connotes a specific intent requirement. Other circuits have so held in interpreting § 2778 or its predecessor provision. *See United States v. Hernandez,* 662 F.2d 289, 292 (5th Cir.1981); *United States v. Wieschenberg,* 604 F.2d 326, 331 (5th Cir.1979); *United States v. Davis,* 583 F.2d 190, 193 (5th Cir.1978); *United States v. Lizarraga-Lizarraga,* 541 F.2d 826, 828 (9th Cir.1976). Proof of specific intent to commit a § 2778 violation thus necessarily subsumes the intent to commit the predicate felony required by § 924(b). Because we cannot assume, absent an explicit statement of Congressional intent, that the *Blockburger* rule is to be superseded, *see Whalen v. United States,* 445 U.S. 684, 692, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980), we must vacate the sentences on appellant's § 924(b) and § 2778 convictions, and remand to the District Court for resentencing under either statute but not both.

We do not believe that the Supreme Court's recent decision in *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed. 535 (1983), compels a different result. There, the Court determined that a legislature may specifically authorize cumulative punishment under two statutes which proscribe the same offense according to the *Blockburger* test, notwithstanding the constitutional prohibition on double jeopardy. —— U.S. at ——, 103 S.Ct. at 679, 74 L.Ed. at 544. In *Hunter,* however, the very language of the statute at issue stipulated that punishment should be "in addition to" any punishment prescribed by other statutes for the same acts. Here, § 924(b) is at best ambiguous, and the legislative history is silent. We have previously recognized that where ambiguity exists in such a situation, doubts should be resolved in favor of lenity. *See, e.g. United States v. Barrington,* 662 F.2d 1046, 1054 (4th Cir.1981). Furthermore, we note that in 1971, Pub.L. No. 91–644, Congress amended subsection (c) of § 924, the companion provision of § 924(b), by authorizing cumulative punishment with the phrase "in addition to"; had Congress wished to make § 924(b) a cumulative punishment statute, it could easily have inserted a similar amendment simultaneously. That Congress has not done so is persuasive evidence of legislative intent.[4]

Our holding that appellant may not be punished for both his § 924(b) and § 2778 offenses does not mandate a new trial. Given the duplication of elements in the § 2778 and § 924(b) counts, no irrelevant and possibly prejudicial evidence was before the jury. Nor do we believe that the mere inclusion of the multiplicitous counts in the indictment resulted in any undue prejudice. We therefore decline to order a new trial.

### III.

Appellant raises several other less substantial claims of error, which we reject.

A. Initially, Wilson contends that the District Court's jurisdiction over his person was improperly acquired by fraud on the part of the government. The essential facts pertaining to this issue are not in dispute. Following his April 1980 indictment in the District of Columbia for unlicensed export of explosives and conspiracy

---

**4.** We reject appellant's claim that the term "therewith" in § 924(b) should be read to limit the statute's applicability to transport of a firearm in connection with violent felonies. "Therewith," as we understand it, merely con-

notes that the firearm have some relationship to the predicate felony charged. A review of the legislative history does not support a contrary view.

to solicit murder, Wilson remained a fugitive from justice until 1982, when Ernest Keiser, an acquaintance who was working for the government, persuaded him to leave his refuge in Libya for the Dominican Republic. Keiser pretended to be representing the National Security Council, which purportedly wanted to consult with Wilson, and he offered assurances that Wilson would be safe in the Dominican Republic. Wilson voluntarily left Libya, and was denied entry by Dominican officials at the Dominican airport; he was then taken into custody by United States agents and put on a plane bound for New York City. Wilson was arrested at the John F. Kennedy International Airport on June 15, 1982.

■■■ It has long been the general rule that a court's power to try a criminal defendant is not impaired by the government's use of even forcible abduction to bring the defendant within the court's jurisdiction. *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952); *Ker v. Illinois,* 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886). The Second Circuit, in *United States v. Toscanino,* 500 F.2d 267 (1974), found a due process exception to the *Ker-Frisbie* doctrine where the government had secured control over the defendant by reprehensible methods including torture, and acted in violation of a treaty with the nation where the defendant was apprehended. Wilson's reliance on *Toscanino,* however, is misplaced. For even if we were to adopt *Toscanino's* holding, its facts are clearly distinguishable. Here there is no evidence of "conduct that shocks the conscience," *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), nor has the appellant asserted any United States infringement of Dominican sovereignty; to the contrary, Dominican officials appear to have cooperated in Wilson's capture. Wilson has simply been the victim of a nonviolent government trick, and as the Second Circuit has made clear, *see United States ex rel. Lujan v. Gengler,* 510 F.2d 62,

65, *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975), any irregularity in a criminal defendant's apprehension will not vitiate proceedings against him.

B. The trial judge chose not to grant a continuance requested by defendant to allow a previously subpoenaed defense witness, General Anderson, to testify. Wilson presents this decision as a denial of his due process and compulsory process rights. Even assuming that General Anderson would have testified, as appellant claims, that the M–16 rifle at issue in this case had been inoperable while he owned it several years before, we do not believe that reversal of appellant's convictions related to that firearm is warranted.

■■■ The granting of a continuance lies within the discretion of the trial judge, and whether that discretion has been abused depends on the circumstances of each case. *See Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964); *Shirley v. North Carolina,* 528 F.2d 819, 822 (4th Cir.1975). Here, we find no abuse of discretion in denial of the continuance on the ground of lack of diligence by defense counsel. We note that appellant's claims of difficulty in reaching General Anderson seem exaggerated, given that the government was able to contact him with minimal effort through directory assistance. Moreover, an examination of the record convinces us that General Anderson's testimony, far from being "essential," would have been cumulative and of limited relevance.[5] Another witness, Paul Cyr, who owned the weapon more recently than General Anderson, testified that he believed the M–16 to be an inoperable presentation piece. The government has proffered evidence that the M–16 could easily have been restored to operational condition, while there is testimony in the record that Wilson was able to fire the M–16 in Libya. The jury, we believe, had adequate evidence before it to decide the issue of operability, and could

**5.** The operability of a weapon is legally relevant to the definition of a "firearm" under 18 U.S.C. § 921(a)(3), but the weapon need not be operational in its condition as transported in foreign commerce, so long as it "may readily be converted" to that status.

properly have inferred that Wilson would not have paid $10,000 for a useless weapon.

C. The government's attorney remarked in his opening statement and closing argument, and introduced evidence during the trial, on the substantial value of Wilson's contracts, for arms and other matters, with the Libyan government.[6] We find no merit in appellant's contention that he was unduly prejudiced thereby.

Evidence relating to Wilson's contracts was properly admitted to meet the government's burden of proof on the specific intent requirements of the conspiracy and 22 U.S.C. § 2778 offenses charged. We believe that the potential gain from Wilson's commercial relationship with the Libyans was quite relevant to his willingness to go to such expense and effort to procure the weapons at issue, and also served to rebut Wilson's good faith defense. Furthermore, the line of questioning pursued by the defense "opened the door" to much of the specific testimony about the contracts. The trial court properly exercised its discretion, under Fed.R.Evid. 403, to allow this evidence notwithstanding the possibility of wealth bias. The defense had ample opportunity during the trial to correct any misrepresentations by the government.

D. Appellant next challenges his convictions under 18 U.S.C. § 922(e),[7] alleging insufficiency of evidence and unconstitutionality of the statute.

Applying the standard of *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457,

469, 86 L.Ed. 680 (1942) and *United States v. Steed,* 674 F.2d 284, 286 (4th Cir.1982) (en banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 67, 74 L.Ed.2d 68, we find that there is substantial evidence, assessed in the light most favorable to the government, from which the jury might have concluded that Wilson had the requisite general intent with respect to the failure to give notice to the carrier. Given the clandestine nature of the conspiracy and the criminal liability faced by all participants, Wilson would hardly have expected his co-conspirator Slocombe to jeopardize the operation by giving notice that firearms were being transported.

We further reject appellant's claim that § 922(e) is unconstitutional because it focuses on an inherently suspect group, i.e. illegal firearms dealers, and compels them to admit their guilt by giving notice of their crimes to a common carrier, thereby violating the Fifth Amendment privilege against self-incrimination. Only one circuit, to our knowledge, has adopted this position. *United States v. Flores,* 729 F.2d 593 (9th Cir.1983). Not every requirement to provide potentially incriminating information, however, poses constitutional difficulties. *Cf. California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (plurality opinion) (notification requirement under "hit and run" statute). Although transport of firearms falls within an "area permeated with criminal statutes," *Albertson v. SACB,* 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965), all passengers on a common carrier are required by § 922(e)

---

**6.** The government asserted that Wilson's various contracts with Libya were worth approximately $22 million, and Roberta Barnes, Wilson's office manager, testified that the gross value of the contracts was $20–21 million, while actual profit would have been substantially less. Peter Goulding, another Wilson employee, testified that it was standard practice for Wilson, in dealing with the Libyans, to inflate prices 30–100 percent. In closing, the government stated that Wilson ended up with $20–22 million from his contracts.

**7.** 18 U.S.C.A. § 922(e) reads in full:
It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to

persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter.

to give some form of notice if they possess firearms, at least by turning their firearms over to the custody of the carrier's operator. While the notice requirements are marginally more stringent for persons delivering weapons illegally, this hardly raises the specter of the "substantial hazards of self-incrimination" with which the Court has been concerned. *Marchetti v. United States,* 390 U.S. 39, 61, 88 S.Ct. 697, 709, 19 L.Ed.2d 889 (1968). For the common carrier is the only party to receive the required notice, and it need not inform any government officials to itself escape liability under the companion statute, 18 U.S.C. § 922(f),[8] but can simply refuse to transport the weapons. Indeed, the legislative history of § 922(e) indicates that its primary purpose was not the apprehension of illegal arms dealers; rather, it was designed to enable common carriers to fulfill more effectively their own statutory responsibilities under § 922(f). *See* H.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 4410, 4420. Thus, *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) is distinguishable, for

there the self-incrimination issue arose from the defendant's obligation to register an illegally possessed firearm *with the government.* The mere possibility that a common carrier might provide incriminating information to the government, we find, does not render convictions for failure to give notice under § 922(e) unconstitutional.[9]

E.  At trial and in pretrial hearings, appellant sought to develop a defense that his illegal firearms exports were undertaken in good faith, as part of a covert scheme to penetrate the Libyan government and secure valuable information for United States intelligence agencies. He now contends that he was denied a fair trial by the District Court's refusal to grant a proposed instruction on good faith,[10] and by pretrial exclusion, pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C.A. (Supp.1983), 94 Stat. 2025, of certain evidence that the defense wanted to submit.

■ The District Court properly denied appellant's requested instruction on the ground that there was insufficient evidence to justify it. *See United States v. Williams,*

---

**8.** The text of 18 U.S.C.A. § 922(f) reads in full:

It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm or ammunition with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

**9.** The Supreme Court has recognized that private searches by common carriers, even though routinely followed by notification to authorities of the discovery of any contraband, are not treated as government searches subject to Fourth Amendment limitations. *Illinois v. Andreas,* —— U.S. ——, ——, 103 S.Ct. 3319, 3322 77 L.Ed.2d 1003, 1009 n. 2 (1983). Likewise, we think that a private party's receipt of incriminating information does not pose Fifth Amendment problems unless that party has been transformed, by legal obligations to inform authorities, into an agent of the government.

**10.** The requested instruction at issue, No. 15, read in relevant part as follows:

In determining whether the government has met its burden of proving that Edwin Wilson acted willfully with a specific intent to violate a known legal duty, you should realize that if the defendant believed in good faith that his ac-

tions were lawful or that he acted without specific intent, then it is your duty to return a verdict of acquittal.

It is Edwin Wilson's contention in this case that he did not act willfully or with a specific intent to export any firearms illegally. In particular, it is the defendant's contention that because he believed in good faith that his actions were in furtherance of the national security interests of the United States, he never formed the specific intent to commit an unlawful act—a specific intent which the government must prove beyond a reasonable doubt.

. . . .

Remember also that if you find that Mr. Wilson's belief about the lawfulness of his conduct was sincere and in good faith, it is irrelevant whether his belief was correct or whether the CIA actually authorized him to supply firearms. It is only the honesty and reasonableness of his belief that matters, since if the government does not prove that Edwin Wilson had a specific intent to act unlawfully then he cannot be convicted . . . .

Propose instructions Nos. 16, 17, 20 and 25 repeated this theory in various forms.

We find no merit in appellant's claim that denial of his proposed instructions on ignorance of law (Nos. 12 and 21) was improper. The trial court's standard instruction was adequate.

604 F.2d 277, 281 (4th Cir.1979), *cert. denied* 444 U.S. 967, 100 S.Ct. 457, 62 L.Ed.2d 381 (1979). Testimony offered at trial indicated that Wilson had, during the period of his activities in Libya: 1) twice met with United States government officials in Europe; 2) received a list of Russian military equipment from a CIA agent; 3) had employees attempt to secure a piece of Soviet equipment and to penetrate the operation of an international arms distributor; 4) sent plans of indeterminate value for an atomic bomb and a nuclear reactor to United States officials; and 5) spoken in code with his employees over the telephone to frustrate possible Libyan monitoring. Two of Wilson's employees initially believed that he was still connected with the CIA. None of this evidence shows that Wilson was still working for the government, or that he had ever been expressly or impliedly authorized by government officials to export firearms illegally. In *United States v. Miller,* 658 F.2d 235 (4th Cir.1981), where we recognized a defense of good faith reliance on the expert advice of a government official as negating intent to defraud, there was direct evidence that the defendant had acted according to the official's express instructions. Likewise, in *United States v. Barker,* 546 F.2d 940 (D.C.Cir.1976), Judge Wilkey's opinion recognizing a mistake of law defense based on good faith reliance on apparent authority emphasized that the defendants' mistake had to be objectively reasonable. *See id.* at 947–48. There, the defendants were actually enlisted by a White House official to perpetrate their illegal search. It is quite different for Wilson to claim that he could be found to lack the specific intent required for conviction on the conspiracy and § 2778 counts, merely because he occasionally met with government officials, while undertaking private information-gathering operations and sending the government unsolicited plans of indeterminate value. Such an unwarranted extension of the good faith defense would grant any criminal *carte blanche* to violate the law should he subjectively decide that he serves the government's interests thereby. Law-breakers would become their own judges and juries.

Nor was appellant denied an opportunity to establish his good faith defense by the pretrial exclusion of certain classified information from evidence pursuant to the Classified Information Procedures Act (CIPA). CIPA creates uniform procedures allowing a court in criminal cases to rule on the admissibility of classified information before its introduction in open court. Thus, the government is able to ascertain whether it should proceed with a prosecution knowing the risks to national security posed by the disclosure of relevant classified information, and opportunity for "greymail" by defendants—the threat of disclosure of unspecified classified information at trial—is minimized. *See* S.Rep. No. 823, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 4294, 4295–98. Following a government request under CIPA, the District Court ordered Wilson to file a written submission identifying classified information that he intended to disclose at trial, under §§ 2 and 5 of CIPA. Judge Oren R. Lewis held an *in camera* hearing on November 5, 1982 to determine the relevance and admissibility of this information, as authorized by CIPA § 6(a). Wilson's submission broadly stated ten areas of information related to his intended defense, only three of which were found to be classified. Wilson also sought to subpoena seventeen individuals, including high-ranking government officials, and requested broad production of documents through subpoena *duces tecum* from several government agencies. The District Court, in a memorandum opinion filed November 12, 1982, specifically determined that none of the classified information Wilson sought was relevant or material to the issues in the case. The Court allowed Wilson to present his defense that he was working for the United States in an undercover capacity in Libya, and to call witnesses to corroborate this claim, so long as none of the classified information determined to be irrelevant would be disclosed thereby. Initially most, and eventually all, of the individuals who could be properly served were made available to testify, while the subpoenas *duces tecum* were quashed for lack of specificity. At trial, Wilson offered

evidence on only two of the ten areas discussed in his pretrial submission—the transmission of "atomic bomb" plans and the receipt of a Russian equipment list—and did not call any of the witnesses whom the Court had allowed him to subpoena. Nor did Wilson ever seek reconsideration of the Court's ruling on disclosure of the classified information before the trial judge prior to or during trial, as permitted by CIPA § 6(d). Under the circumstances, we decline to find that the District Court's exclusion of classified information according to CIPA deprived appellant of a fair opportunity to mount his defense. Nor do we perceive any basis for holding, on the facts before us, that the provisions of CIPA are unconstitutionally vague, or that CIPA denied appellant his right to confront witnesses or his privilege against self-incrimination.

### IV.

For the reasons stated, we vacate appellant's sentences under 18 U.S.C. § 924(b) and 22 U.S.C. § 2778, remand to the District Court for proceedings consistent with this opinion, and otherwise affirm.