**UNITED STATES of America**

v.

**H. Leonard BERG, Grimm Depanicis, Leon Lisbona, Solomon Schwartz, and HLB Security Electronics, Ltd., Defendants.**

**No. 84 CR 190(S).**

United States District Court, E.D. New York.

Sept. 12, 1986.

1474

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by David V. Kirby, Larry H. Krantz, for U.S.

J. Jeffrey Weisenfeld, New York City, for defendants Berg and HLB Sec.

James T. Moriarty, New York City, for defendant DePanicis.

Paul A. Goldberger, New York City, for defendant Lisbona.

George David Rosenbaum, New York City, for defendant Schwartz.

## MEMORANDUM AND ORDER

PLATT, District Judge.

This case is before the Court to decide numerous pre-trial motions submitted by the various defendants. Without going into unnecessary detail, the case involves a corporation and a group of individuals who in a 42-page, 14-count indictment are essentially charged with illegally trafficking in firearms and other equipment whose export is restricted by the Arms Export Control Act. Defendants are charged with, *inter alia,* conducting an enterprise which engaged in racketeering activity in violation of 18 U.S.C. § 1962, the so-called "RICO Act," as well as violations of the Arms Export Control Act, 22 U.S.C. § 2778.

Defendants Berg, Lisbona, DePanicis and HLB Security Electronics, Ltd. seek discovery, a bill of particulars, the striking of surplusage from the indictment and a ruling permitting defendants to raise at trial the defense of reasonable reliance upon governmental authorization. Defend-ant Schwartz seeks a severance, dismissal of the indictment, discovery, a bill of particulars, an order suppressing any audio or video recordings, an order "controverting" the search warrant and permission to present the defense of good faith reliance at trial. The Government has moved for an order precluding the introduction of defendants' authorization defense.

### I. *The Superseding Indictment*

The lengthy indictment in this case charges defendants with four illegal schemes. One involves the illegal export of 1,300 night vision devices to Argentina during the Falkland Islands War with Great Britain. The second concerns an attempt illegally to export firearms and ammunition to Iraq. The third illegal transaction involves the planned shipment of 400 night vision goggles to the Soviet Union, which included the actual shipment of one sample goggle to West Germany. The fourth scheme involves the attempted shipment of a planeload of arms and ammunition to Poland.

All of the defendants appear to be involved with one another through various corporate entities engaged in the international arms trade. For the purposes of these motions the Court is primarily concerned with the last illegal transaction, the attempted shipment of arms to Poland via an airplane which was detained by United States Customs authorities at John F. Kennedy Airport on February 28, 1984.

### II. *The Defense of Reasonable Reliance Upon Governmental Authorization*

The central thrust of defendants' motions is their application to have the Court permit the introduction at trial of a defense of good faith reliance upon governmental authorization. This proffered defense is directed at the arms shipment intended for Poland. The defendants give various alternative labels for the defense, *i.e.,* entrapment, violation of due process, negation of intent, etc. However, the desired end result is the same: that the Court permit the introduction of evidence of defendant

Schwartz's previous communications with intelligence agencies of the United States. To this end, many of defendants' discovery requests seek the acquisition of classified material to be used in support of this defense.

### A. *Factual Background and Defense Proffer* [1]

In response to previous motions directed against the underlying indictment, the Court held a hearing and in addition received the submission of numerous classified documents *ex parte*, to determine whether there was any basis upon which to permit a defense of governmental authorization in this case. Based on these materials as well as the additional submissions of the parties, the Court can make certain limited factual findings.

It appears that at least for a period in the 1980's prior to February 2, 1984, defendant Schwartz had a relationship with certain agencies of the United States Government. Schwartz apparently had business communications with officials of the Polish government and on occasion traveled directly to Poland. There came a time when Schwartz met with officials of the Defense Intelligence Agency ("DIA") and the possibility of Schwartz obtaining two Russian model T–72 tanks manufactured in Poland was discussed. The DIA expressed an interest in acquiring the T–72 tanks from Poland and encouraged Schwartz to continue his efforts in that regard. Several meetings between Schwartz and DIA officials were held at which there were discussions concerning the T–72 acquisition effort.[2]

There also were communications between Schwartz and the Federal Bureau of Investigation ("FBI"). These were totally unrelated to the DIA–Schwartz relationship. Schwartz expressed a willingness to provide information to the FBI about Polish Nationals present in the United States who were attempting to obtain United States technology. There were some meetings between Schwartz and an FBI agent engaged in counterintelligence activities but it appears that little came of this "relationship" and it was terminated by the FBI for reasons not relevant to the issues in this case.

Although it is not entirely clear, defendants' proffer seems to suggest that the attempted illegal export of arms to Poland was somehow tied to Schwartz's "efforts" to acquire the T–72 tanks for the DIA. Defendants have not elaborated on whether the shipment of arms which was seized by the United States Customs Service was meant to be part of a trade for the T–72 tanks, as a bribe to some Polish official, or perhaps just an offering of good faith in furtherance of the negotiations concerning the tank acquisition. To date it has been left for the Court to speculate as to how the attempted export of arms to Poland was designed to facilitate obtaining the tanks.

The defendants themselves cannot agree on the formulation of their offer of proof. Schwartz's present attorney, George David Rosenbaum, Esq., submitted an affidavit which contains no specific factual allegations at all but rather extremely general, vague, conclusory statements. Rosenbaum states that "this particular defense [good faith reliance on governmental authorization] is unavailable to the co-defendants herein in that upon information and belief,

---

1. Many of the documents sought by the defendants are classified. Moreover, many of the witnesses defendants seek to call in support of their authorization defense occupy sensitive positions. It is impossible for the Court to tell whether revealing the names of individuals involved would damage national security. Furthermore, mere discussion of the people, entities and activities involved might compromise secrets by inadvertently revealing the sources and methods of United States intelligence organizations. For this reason the Court will keep

the factual discussion to a bare minimum, mentioning only the most essential items in the interests of avoiding the classification of this very decision.

2. There is also some evidence that Schwartz may have had dealings with the CIA regarding the attempt to acquire the tanks. The details of this relationship are not necessary for the resolution of the issues before the Court.

only defendant Solomon Schwartz was privy to and had access to the various governmental officers granting the requisite authorization." Rosenbaum Aff. at 3. Rosenbaum does not elaborate at all as to the specifics of the "authorization" given to Schwartz. He just broadly proclaims that after viewing the deposition testimony of a government witness, James L. Hetrick, it is clear that "Schwartz was authorized to take the appropriate and necessary actions to obtain the tanks." Rosenbaum Aff. at 10.

Defendant Berg's attorney, J. Jeffrey Weisenfeld, Esq., makes more specific factual allegations. Weisenfeld asserts that Schwartz advised defendant Berg of the meetings between Schwartz and intelligence officials regarding the acquisition of T-72 tanks and that Berg and the other defendants relied on the statements of Government employees to Schwartz. Weisenfeld Aff. at 13-14. As to the authorization given to Schwartz, Weisenfeld relates:

Schwartz was told that the obtaining of the T-72 tanks (which had a new composite alloy armor), was of the highest priority and that the United States had been trying unsuccessfully for years to obtain them. Schwartz was also told that he should do whatever he had to to achieve this result. He was told in a semi-serious manner that he should not kill anyone and that he should not try to trade hi-tech items for the tanks, but that other than these restrictions, he should do what he had to. Schwartz also made it clear at these meetings and conversations, that he would have to violate the law in some regards to get the tanks. He was told that since he was taking these actions on behalf of the United States Government, such acts would not be a violation of law.

Defendants' Memorandum of Law in Support of Their Motions at 14 (hereinafter "Defendants' Memorandum").

■ Mr. Weisenfeld correctly points out that Schwartz is bound by the representations made by Schwartz's prior counsel, in open court, in the presence of Schwartz. *See* Defendants' Reply Memorandum at 2. In a prior proceeding, in open court, Charles Hayden, Esq., Schwartz's former counsel, stated, among other things, that Schwartz "was given a free hand in how to deal with the Poles to get the tanks and get information," that Schwartz was asked "to do what he could to get tanks," and finally, "his [Schwartz's] entire relationship [to the DIA], not only 'do this,' but 'do something, do something else, find out what they want.' This man was built up, a double O seven, to go over there and do it for your government." Minutes, June 27, 1984, at 27, 74-75.

Mr. Hayden's statements closely resemble the proffer offered by Mr. Weisenfeld. Given the absence of an affidavit from Schwartz or any other defendant and the lack of any specificity in Mr. Rosenbaum's statements, the Court accepts the proffers offered by Messrs. Weisenfeld and Hayden as binding on all of the defendants.

### B. *Application of the Law*

The issue to be decided is whether the defense proffer, as outlined above, has made out a recognizable defense as a matter of law. The answer to this question will resolve whether defendants will be permitted to present their purported defense at trial as well as whether the Court should grant defendants' numerous discovery requests for classified material which arguably is related to this defense.

■ Although a defendant has no right to present inadmissible evidence to a jury, the law of this Circuit requires that before a Court may rule on the admissibility of a defense as a matter of law, it must accept the facts offered by the defendant as true. *See United States v. Bifield*, 702 F.2d 342, 346 (2d Cir.), *cert denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). This being the case the Court reluctantly accepts the proffer offered by the defendants as true for the purpose of deciding whether the proffer makes out any admissible defense.

The Court would like to note, in passing, how illogical it is to accept the defendants' proffer as true. At a prior hearing before this Court, the key DIA official who had dealt with Schwartz categorically denied giving Schwartz the authorization to do whatever he had to do to obtain the T–72 tanks. Minutes of Hearing, July 2, 1984, at 82–83, 84. The witness stressed throughout his testimony that the tank acquisition by Schwartz was to be strictly a cash transaction, involving nothing else. The witness testified that at their very first meeting he stressed the following to Schwartz:

> That if he had been in the past engaged in any activities that were questionable or currently engaged in any such activities, that he could not use his association with our office or his contact with our office to cover those activities.

Minutes, July 2, 1984, at 75–76.

The FBI Agent who had dealt with Schwartz about the possibility of obtaining information from him on Polish Nationals present in the United States, repeatedly denied telling Schwartz that he should do whatever he had to do to obtain information or that he had authorized Schwartz to commit any criminal act. Minutes, July 2, 1984, at 29, 38–39, 41. Finally, Mr. Hetrick, the other DIA official involved with Schwartz denied ever giving Schwartz a blanket authorization to do whatever was necessary to obtain the tanks and also denied giving Schwartz any specific authorization to export weapons to Poland, transship weapons through Poland or exchange information or any other item in order to obtain the Polish tanks. Deposition, July 20, 1984, at 14, 15, 57, 58, 79.

The Court has no reason to doubt the credibility of these witnesses. Furthermore, it is extremely difficult to accept the defendants' proffer. It is difficult to believe that there exists in any of the intelligence services of our country an agent who is so well trained, so proficient in the skills of espionage and so highly regarded that his superiors trust him to the extent of giving him blanket authority to do whatever that agent thinks is necessary to achieve a vital goal of the United States. Surely, no experienced intelligence officer would abdicate his supervisory functions and give an agent unlimited discretion, without guidance or supervision, to do whatever *that agent felt* was necessary or reasonable in achieving the goal in question. Yet the defendants would have this Court believe that experienced intelligence officials of this country placed Schwartz, an untrained, untested, outside informant, in this role. Schwartz's prior counsel, Mr. Hayden, advocated this absurd view:

> There was authorization to take such reasonable steps in the interest of the United States Government, as he [Schwartz] thought reasonable, to bring a tank out of Poland. And there is some evidence of that now. So that it seems to us ... that he was working so closely with them, [the DIA] and they led him to believe that he was working closely with them that he had a right to send an airplane to Poland under the terms of his relationship with them.

Deposition, July 20, 1984, at 95.

It would be a frightening thought if it were true that members of the United States intelligence community were authorized to act without supervision, solely at their discretion as to what steps are reasonable in order to achieve a given goal. The Court may not accept that this actually occurs with any low-level or high-level intelligence agency employee, let alone with an outside, untested informant such as Schwartz. Indeed, it would not be unreasonable to rule that the proffer of defendants is incredible as a matter of law and throw out this purported defense as a misguided concoction of some defense attorneys who have read one spy novel too many or were trying to emulate similar types of defenses repeatedly offered in similar cases,[3] or both.

---

**3.** Before an appellate panel or other reader takes umbrage at these observations, which are concededly *dicta,* let them reflect upon the fact that the "standard" defense in this type of case

However, not wanting to be accused of not having considered defendants' claims properly, the Court will accept the proffer as true and subject it to further analysis. The issue now becomes: assuming an individual was told to do whatever he had to do by an intelligence official of the United States Government to achieve an intelligence goal for the United States, does this broad authorization constitute a defense to later criminal acts committed in furtherance of that intelligence goal?

Defendants have advocated that this scenario may constitute a defense under various theories: good faith reliance, entrapment, due process, intent, mistake of law, etc. The authorization giving rise to these theories is somewhat akin to the authorization given in the popular James Bond movies, where Bond, Agent 007, the ultimate super agent, has a "license to kill" in order to achieve the goals of his nation's intelligence service. Lacking any better term for defendants' proposition and to distinguish it at least by name from the traditional "CIA" defense, the Court will refer to it as the "007 defense."[4]

The closest traditional defense theory which the 007 defense even remotely resembles is the mistake of law defense.[5]

In *United States v. Barker*, 546 F.2d 940 (D.C.Cir.1976), two minor participants in the so-called Watergate affair, Bernard Barker and Eugenio Martinez were prosecuted for their part in the burglary of the offices of Dr. Lewis J. Fielding. Barker and Martinez claimed that E. Howard Hunt, who in his former legitimate CIA role had been associated with Barker in the course of covert operations, had ordered the break-in. The defendants claimed that Hunt told them he was working for a White House entity with greater jurisdiction than the CIA or FBI and that the break-in was necessary to obtain national security information against a traitor spying for the Soviets. The Appellate Court in a 2–1 opinion decided that this defense should have been available to the defendants. An exception to the axiom that "ignorance of the law is no defense" was recognized.

Judge Malcolm Richard Wilkey in *Barker* decided that an exception to the usual rule that a mistake of law is no defense would be allowed for those defendants who could show both:

(1) facts justifying their reasonable reliance on a "government official's" apparent authority and (2) a legal theory on which to base a reasonable belief that the "government official" possessed such authority. Judge Wilkey felt that it was reasonable for the defendants to rely on Hunt's authority given Hunt's prior CIA position and his then legitimate ties to the White House staff. Judge Wilkey also felt that there was a legal theory to believe that Hunt had the authority to authorize the break-in. That theory was the alleged constitutional power of the Chief Executive to order warrantless intrusions for national security purposes.

Judge Robert R. Merhige's concurring opinion in *Barker* also held that the defendants should have been allowed to present their mistake of law defense, but under a

---

was and is patterned after those books of a couple of decades ago, all of which began their titles with "I Was A. . . ." In these more recent versions the balance of the title is "CIA Agent," "DIA Agent," etc. In this District alone we have had several IRA cases with a variety of alleged "gun runners" claiming to be "agents" of the CIA and political activists in an effort to prevent their convictions for similar offenses. In the last case of this type wherein this "standard" defense was proffered before the undersigned, the Government's pretrial motion to suppress was granted following a hearing which revealed the defense claim to be as preposterous as that tendered here.

**4.** Should the reader not wish to accept Mr. Hayden's characterization, the defense here could perhaps be referred to as the "Mission Impossible" defense.

**5.** Entrapment is not applicable here because the Government officials did not suggest the crime to the defendants; they concededly knew nothing about the crime which Schwartz planned and committed. The other theories are essentially encompassed within the "mistake of law" defense and are discussed hereinafter in connection therewith.

different, more limited rule. Judge Merhige adopted the Model Penal Code's defense of a reasonable reliance upon an official interpretation of law. He held that defendants had to meet the following formulation to present a mistake of law defense: an individual must show objectively reasonable reliance upon a conclusion or statement of law issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field. *See Barker* at 955. As to Hunt's statements being an official interpretation of law issued by an official with responsibility in that area, Judge Merhige noted:

> The Executive Branch of the United States Government is vested with substantive responsibilities in the field of national security, and decisions of its officials on the extent of their legal authority deserve some deference from the public.

*Barker* at 957.

The Second Circuit dealt with the mistake of law issue in *United States v. Duggan*, 743 F.2d 59 (2d Cir.1984). In *Duggan* members of the Provisional Irish Republican Army claimed that they thought an FBI informant was a CIA agent who had the authority to authorize the shipment of arms and munitions to Northern Ireland. They stressed that the informant had shown them a "CIA Identification Card" and that they believed he was a bona fide CIA agent. The Court rejected Judge Wilkey's theory in favor of the more traditional exception to the mistake of law doctrine advocated by Judge Merhige. The Court went on to hold that even under Judge Wilkey's more liberal version, the defendants had set forth no defense. *See Duggan* at 83–84.

In the case at bar, defendants assert that they meet the requirements of the mistake of law defense as accepted in *Duggan.* They stress that Schwartz met with genuine officials of the Government and thus there is no question as to apparent vs. real authority. *See* Defendants' Memorandum of Law at 16. Defendants also claim that

it is both entrapment and a violation of due process for Government officials to tell defendants "to do something or that it is not illegal to do so" and then be prosecuted for acting in reliance upon those representations.

The Government argues that defendants have not made out a defense. The Government contends that no one in the DIA has the authority to authorize the violation of United States law and that indeed, if anyone in the DIA did in fact do so (the Government's position is that no authorization was ever in fact issued), they would be subject to criminal prosecution. It is further contended that the DIA does not administer, interpret or enforce the laws defendants are accused of violating and thus DIA officials are not the appropriate ones on which to base reliance. Various hypotheticals are set forth showing the absurd possibilities that would arise if minor Government officials were allowed to authorize a wide variety of criminal acts. The Government also claims that the statements attributed to the DIA by defendants are too broad to constitute an official interpretation of law upon which reliance can be based. Finally, the Government argues that the facts of this case do not meet the requirements of an entrapment defense and do not defeat the specific intent of the crimes defendants are charged with.

■ The Court need not decide such issues as whether DIA employees interpret the law nor need the Court discuss such items as the policy reasons for the usual rule that a mistake of law is no defense. It is clear to the Court that the 007 defense advocated here may never be accepted as a legitimate defense, be it labeled entrapment, mistake of law, good faith reliance, lack of intent, due process, etc.

The key fact in the defendants' proffer is that the DIA officials, regardless of their authority to issue interpretations of law, were never given *advance* notice of defendants' criminal acts. In other cases Government officials were always given notice. In *Barker*, the Government official, Hunt, laid out the details of the criminal act to

the defendants before it was to be committed. In *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), police officials had prior notice of a demonstration planned in front of a courthouse and were present when it in fact occurred. Here, defendants advocate that they had *carte blanche* to do whatever was necessary to obtain the T–72 tanks and then took it upon themselves, without first informing the DIA or any other Government official, to attempt to ship armaments illegally to Poland in furtherance of that goal. That this is the defendants' position is clear. Nowhere is it asserted that Schwartz or anyone else specifically informed a Government official that a shipment of arms to Poland was planned. Schwartz's first attorney, Mr. Hayden, admitted in open court that there was never any discussion with Government officials about shipping weapons to Poland. Minutes, June 27, 1984, at 46, 75. All of the defense arguments taken as a whole, seem to stress that unlike the extreme hypotheticals presented in the Government's memorandum; the crimes committed by Schwartz and the other defendants were reasonably related to furthering the goal of obtaining the T–72 tanks. Nowhere is it claimed that Schwartz told a Government official, "I have to ship weapons to Poland," and that that official either approved of or acquiesced in such a crime.

■ The Court may not accept the defendants' proffer as making out a valid defense. The argument that the crimes committed by Schwartz and the other defendants were objectively reasonable in order to further a legitimate intelligence goal (*i.e.,* the end justified the means) or that they were committed with the purest of patriotic motives is beside the point. The proposition that a defendant may commit a criminal act without prior notice to any Government official on the basis of a supposed *carte blanche* authorization or a license to do everything but kill is without precedent and stretches any concept of good faith reliance beyond recognition.

In the present case there is no indication that the DIA officials were in any way apprised, by the defendants, of the planned criminal acts when the DIA made its "interpretation of law" or at any time thereafter. Schwartz's prior attorney, Mr. Hayden, does assert in an affidavit that the DIA was told "that an airplane would have to go to Poland to establish a practice and that airplane would be piloted by Joseph Haas." Hayden Aff. at 2. However, this is, of course, an incomplete version of the facts. As mentioned earlier, Hayden admitted that Schwartz did not tell the DIA of the planned arms shipment to Poland. Defendants may not argue that they in good faith relied on an official interpretation of law when they did not first supply the official in question with all the relevant facts.

■ An analogy can be drawn to the defense of good faith reliance upon the advice of counsel. In order to assert such a defense a defendant must show that he or she *fully* informed the attorney in question of *all* the relevant material facts *before* undertaking the conduct at issue. See *United States v. King,* 560 F.2d 122, 132 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977). The defendant may not give his attorney an incomplete version of the facts and then act in reliance, arguing that the attorney should have investigated further to get the complete picture. See *United States v. Stirling,* 571 F.2d 708, 735 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Similarly, in the present case, defendants may not claim they acted in good faith reliance when they at most, by their own admission, gave the DIA an incomplete account of what was intended. The DIA was under no obligation somehow to foresee that defendants were going to export arms to Poland.

To accept the 007 defense offered by the defendants would create impossible burdens for our criminal justice system. It would put judges and juries in the wholly unprecedented position of deciding from hindsight what crimes were reasonably

foreseeable in pursuit of a legitimate intelligence goal of the United States. To date it has not been a proper function of a judge or jury coldly to calculate the benefits of achieving an intelligence goal and the costs of criminal acts committed in furtherance thereof and then to conclude whether it was justifiable.

Despite defendants' arguments that the crimes committed in this case were reasonably related to the achievement of the intelligence goal in question, the fact remains that acceptance of the 007 defense in the abstract creates the possibility that some people may be above the law under certain circumstances. The concept that a low-level intelligence official could potentially insulate an individual from prosecution for a wide array of crimes is uncomfortable, to say the least. Acceptance of this notion would encourage arms dealers like defendants and other unsavory characters to seek out contact with intelligence agencies in order to obtain a shield for illegal activity. It would be all too easy for defense attorneys to conjure up this defense and then obtain wholly unwarranted discovery of classified materials.

One other court has dealt with a situation somewhat similar to this one. In *United States v. Wilson*, 721 F.2d 967 (4th Cir.1983), the defendant, Edwin Wilson, was an ex–CIA agent charged with exporting firearms to Libya. Wilson attempted to introduce a defense that his firearms exports to the Libyans were part of a good faith effort to obtain intelligence information for the United States. The District Court refused to instruct the jury on this defense and also excluded much classified material from evidence under the Classified Information Procedures Act. At trial there was some evidence that Wilson had met with officials of the United States Government, made efforts to obtain information from the Soviets, and turned over plans for an atomic bomb to United States officials. The Court upheld the District Court, noting that Wilson had not shown that his arms exports were expressly or impliedly authorized by United States Government offi-

cials. Commenting on Wilson's purported defense, the Court noted:

> Such an unwarranted extension of the good faith defense would grant any criminal *carte blanche* to violate the law should he subjectively decide that he serves the government's interests thereby. Lawbreakers would become their own judges and juries.

*Wilson* at 975.

The reasoning in *Wilson* applies with equal force here. To recognize the 007 defense would mean an abdication of the responsibilities of the criminal justice system to be replaced with a determination of whether a criminal's acts were subjectively reasonable. The rule of law must be preserved. It is unthinkable to accept that a defendant himself would ever be allowed to decide what crimes were reasonable to him and then be insulated from criminal prosecution. A defendant, as the *Wilson* court noted, may not be the judge of his own conduct, to decide for himself what is or is not permitted under the law. This function is left to the values of the community at large as expressed by the statutes enacted by legislators. It would be no different if Schwartz's and the other defendants' alleged blanket authorization was conferred by the Attorney General or the President himself. As has been so often observed, no one may be placed above the law.

■ The defendants may not offer their authorization defense at trial under any theory. The situation might be different if Schwartz had been specifically ordered by DIA officials to export arms to Poland or Schwartz had expressly told DIA officials of his intentions beforehand. However, that case is not before the Court, only the 007 defense has been presented. Accepting defendants' proffer as true, the Court finds that no recognizable defense has been made out as a matter of law. Therefore, the Court grants the Government's motion to preclude defendants' authorization defense. Defendants' various discovery requests for classified information are all denied, as the materials sought are irrelevant to any issue for trial.

III.  *Other Motions*

A.  *Bill of Particulars*

Despite the fact that the Government has filed an exceptionally detailed indictment in this case, defendants have moved for a bill of particulars. Defendant Schwartz's request in this regard runs some twenty pages and contains broad requests that if granted would require the Government literally to disclose its entire case. For example, defendant Schwartz in his request for a bill of particulars asks the Government to "[s]et forth the evidence which supports the allegation that the end user of the arms and ammunition was the Iraq National Police," and with regard to the alleged export of night vision devices to Argentina he asks the Government to "[s]et forth the evidence upon which the government claims that the defendants did not plan to obtain export licensing."

Defendants have already been put on sufficient notice of their charged crimes by the indictment. Their requests for a bill of particulars are denied in their entirety.

B.  *Reliance on Governmental Interpretation of Law*

With regard to the alleged shipment of night vision devices to Argentina, defendants give notice that they wish to assert a defense of reliance on official governmental interpretation of the export licensing law. They claim that there is no prohibition against selling restricted materials to foreign nationals within the United States, only the export without a license of such items is prohibited. Defendants further assert that they have no duty to ascertain whether the buyer within the United States will illegally export the items in question. In support of these contentions defendants point to the sale within the United States of surplus goods by the United States government where anyone, even a foreign national, may obtain goods on the export control list.

■ In response, the Government notes that although some of the defendants' con-

tentions are correct, the law imposes criminal liability on a domestic seller who consciously avoids the knowledge that the items sold would ultimately be illegally exported. Thus, the Government contends that evidence of the custom and practice of the United States Government in the sale of surplus goods is irrelevant and should be excluded.

The Court agrees with the position of the Government in this regard and grants the motion to exclude evidence of the custom and practice of the United States in the sale of surplus goods.

C.  *Miscellaneous Matters*

Defendants' motion to strike surplusage from the indictment has been consented to, in part, by the Government. The Court sees no prejudicial impact resulting from the remaining challenged portions and accordingly the motion of the defendants in this respect is denied.

■ Defendant Schwartz has moved for the suppression of any audio or video recordings. The Government notes that no wiretap orders are involved in this case; all recordings are consensual. The suppression motion is accordingly denied.

Defendant Schwartz's motions to dismiss the indictment, for a severance and for an order "controverting" the search warrant are all frivolous and utterly without merit. They are all denied.

SO ORDERED.