**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Edwin Paul WILSON, Defendant–Appellant.**

No. 88–7785.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1989.

Decided April 13, 1990.

Daniel McCrea Schember, Gaffney, Schember & Kete, P.C. (Michael J. Gaffney, Gaffney, Schember & Kete, P.C., Paul S. Blumenthal, Blumenthal, Carpenter & Berkowitz, Washington, D.C., on brief), for defendant-appellant.

Vincent M. Gambale, Crim. Div., U.S. Dept. of Justice, Washington, D.C. (Theodore S. Greenberg, Acting Chief, Crim. Div., U.S. Dept. of Justice, Henry E. Hudson, U.S. Atty., Alexandria, Va., on brief), for plaintiff-appellee.

Before RUSSELL, PHILLIPS, and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

In this appeal we address for the second time Edwin Wilson's conviction for various offenses related to his sale of arms to the Libyan government. Wilson has appealed the district court's dismissal with prejudice of his collateral attack on his conviction without discovery and without an evidentiary hearing. Wilson's collateral attack had alleged essentially that the government had violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding from Wilson exculpatory evidence.

## I.

A full description of the facts underlying Wilson's trial can be found at *United States v. Wilson,* 721 F.2d 967 (4th Cir. 1983). Briefly, employees of Wilson were caught exporting weapons illegally. At trial, Wilson attempted to advance several defenses including a) that he did not instruct his employees to export the arms illegally and b) that he was actually working in good faith for United States government intelligence, using his arms sales operation as a means of establishing the trust of the Libyan government. Wilson's trial resulted in a conviction.

A unanimous panel of this Court affirmed Wilson's conviction. 721 F.2d 967. We rejected, among other things, Wilson's good faith defense in two ways. First, we held that Wilson had failed to establish a sufficient evidentiary basis to warrant a good faith defense jury instruction. *Id.* at 974. Second, we rejected Wilson's claim that the district court improperly excluded classified documents under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. IV. 721 F.2d at 976. Under CIPA, prior to the introduction of evidence, a court rules on the relevance of classified documents to permit the government to decide whether it wants to proceed with prosecution despite the attendant revelations of classified information. The district court had found that none of the classified

information Wilson sought was relevant. We declined "to find that the District Court's exclusion of classified information according to CIPA deprived [Wilson] of a fair opportunity to mount his defense." *Id.*

Several years after our affirmance of his conviction, Wilson brought a motion *coram nobis* which the district court properly treated as a post-conviction collateral attack under 28 U.S.C. § 2255.[1] The basis of Wilson's motion was essentially that the prosecution impermissibly withheld evidence favorable to Wilson during pretrial proceedings. Several months after the filing of the motion, Wilson requested discovery and an evidentiary hearing, supporting his requests with several affidavits. On January 15, 1988, after hearing oral argument on the necessity of an evidentiary hearing, the district court postponed reaching a decision and instead ordered Wilson to expand the record by submitting specific affidavits and proposed discovery requests. On two subsequent occasions, Wilson supplemented the record with additional affidavits and discovery requests.

After another hearing, the district court issued its decision, denying Wilson's discovery requests and dismissing his entire motion without an evidentiary hearing. The court first held that our affirmance of the prior rulings on CIPA and Wilson's trial discovery requests precluded litigation of Wilson's allegations of suppression of favorable evidence on collateral attack. Second, it held fatal to certain claims the fact that the favorable evidence allegedly withheld was available from witnesses whom Wilson could have called at trial. Finally, it held that Wilson had failed to establish both the existence and the materiality of the one category of evidence (so-called "NSA intercepts," discussed *infra*) that fell outside the ambit of matters resolved by the original trial and appeal. This appeal followed.

## II.

The legal principles that guide our inquiry are familiar. Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, the government must disclose material evidence favorable to the defendant that the defendant specifically requests. Undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *see also id.,* 473 U.S. at 685, 105 S.Ct. at 3385 (opinion of White, J., concurring); *Bond v. Procunier,* 780 F.2d 461, 464 (4th Cir.1986). Furthermore, "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources." *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 184, 93 L.Ed.2d 118 (1986); *see also United States v. Grossman,* 843 F.2d 78, 85 (2d Cir.1988) (no *Brady* violation when defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence") (citations omitted); *Lugo v. Munoz,* 682 F.2d 7, 9–10 (1st Cir. 1982) (government has no *Brady* burden when facts are available to a diligent defense attorney). With these principles in mind, we now address each of the pieces of allegedly material favorable evidence that Wilson claims that the government withheld.

Much of Wilson's argument relies upon the affidavits of Shirley A. Brill. Brill apparently was the cohabitant girlfriend of Tom Clines, a CIA official who was approaching retirement and who was allegedly involved with Wilson. Although Brill states in her affidavit that she was questioned at length on several occasions by

---

1. 28 U.S.C. § 2255 provides, in part:

     A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence.

government officials prior to Wilson's trial, she asserts mostly vague statements with respect to her communication of favorable material evidence to the government. For example, she says that she told U.S. Attorney Larry Barcella "all about" Wilson's alleged interactions with government officials. The sole specific bit of arguably favorable material information Brill alleges to have communicated to the government was that she told Barcella about Clines' alleged intention to "set up" Wilson by framing him for an arms exportation conviction.

■ Although we recognize that any statements Brill may have made suggestive of a set-up could have helped Wilson's case, we find no *Brady* violation because Wilson was free to question Brill in preparation for trial. Indeed, given Wilson's awareness of Brill's closeness to Clines and given Wilson's belief that he was framed, it would have been natural for Wilson to have interviewed Brill in preparation for trial to determine if Brill could have supplied Wilson with exculpatory evidence. In situations such as this, where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.

It is worth noting that in its January 15, 1988 Order, issued after submission of Brill's first affidavit, the district court instructed Wilson to submit an affidavit from Brill setting forth with specificity the testimony she had given to federal officials exonerating Wilson. Despite the unambiguous Order, Wilson responded by submitting two affidavits from Brill, both of which consisted primarily of a rambling story, with mention of the testimony allegedly given to government agents included only as an apparent afterthought. Furthermore, the Brill affidavits ignored the instruction of the district court to indicate whether a transcript of Brill's alleged testi-

mony was known to exist and whether that transcript was in the possession of the United States. We note Wilson's unresponsiveness to the district court's obvious concern for the lack of specificity in Brill's affidavits only because it assures us that rather than representing a tip on an iceberg, the few bits of relevant information contained in Brill's affidavit probably represent an exhaustion of the relevant information she has to offer.

■ Wilson next relies upon the affidavit of National Security Agency ("NSA") expert James Bamford, in which Bamford states his belief that the NSA has intercepted and decoded communications made by Wilson to his American associates. Wilson argues that the alleged existence of these NSA intercepts must be considered in light of the Brill affidavits which, he argues, without citing the record, demonstrate the existence of "international calls from Mr. Wilson to Mr. Clines in which Mr. Clines provided instructions to Mr. Wilson concerning their endeavors on behalf of Mr. [Theodore] Shackley." [2] We assume that Wilson's reference to "instructions" from Mr. Clines is to the statement in Brill's Third Affidavit that Wilson and Clines had lengthy phone conversations in which "occasionally, [Brill] would hear [Clines] say, 'Ed, I think you ought to do this ...' or other remarks like that and [Brill] assumed it was Agency business." Wilson acknowledges that discovery requests may not be so broad and baseless as to constitute a fishing expedition. However, taken in conjunction with Bamford's belief that the intercepts exist, Wilson argues, the Brill affidavits elevate Wilson's request for discovery of the NSA intercepts well above the level of such an expedition. In its dismissal of Wilson's petition, the district court first noted that Wilson had not produced "direct evidence" of the existence of the intercepts. The district court then held that, even if the intercepts did exist, Wilson's argument would nonetheless fail because he had not shown that

---

**2.** Mr. Shackley apparently worked for the C.I.A.

the alleged intercepts contained material evidence.

We agree with the district court that Wilson has supplied no reason to believe that the NSA intercepts, assuming they exist, would be material in the relevant sense of creating a reasonable probability of a different outcome at trial. Even if the intercepts would reveal statements by Clines such as "Ed, I think you ought to do this," our confidence in the outcome of trial would not be shaken. Such statements simply would not establish that Wilson was operating under orders of the United States government. Accordingly, the district court's dismissal of Wilson's motion without discovery was not erroneous.

Wilson alleges also that the government withheld a White House Memorandum concerning EATSCO, an organization apparently involving Wilson along with several Department of Defense officials and others. EATSCO engaged in illegal activities relating to arms sales to other countries for which the government obtained convictions in another trial. We find little in the EATSCO Memorandum representing more than an apparent acknowledgement of Wilson's role in the organization. At best, it indicates that Wilson was engaged in other criminal activity besides the arms sales to Libya for which he was indicted and convicted. Wilson's association with other criminals who happened to be government officials does not support his claim that he "worked for, and at the explicit direction of, high-level CIA officials during the time of the offenses charged." Furthermore, the claim has no bearing on Wilson's criminal liability for the arms sales to Libya. The EATSCO document, even if intentionally withheld, does not come close to constituting a *Brady* violation for it was not material in the relevant sense.

Wilson next identifies the affidavit of Lloyd D. Jones, who used to work for Wilson. According to Jones' affidavit, Wilson often told Jones that information Jones obtained for Wilson was sent to intelligence officials in the United States. Of course, Jones' statement does not substantiate a *Brady* claim for it provides no indication that Jones had informed the government of the statements made in his affidavit. Although Wilson makes the unsubstantiated claim that the FBI interviewed Jones in the Spring of 1983, there is no evidence regarding the content of the interview. In any event, Jones' affidavit would not satisfy *Bagley*'s materiality requirement even if there were some showing that the government had withheld Jones' statements.

Wilson relies also upon a government agent's notes from an interview with Douglas Schlachter, who apparently worked for Wilson. The reliance is unavailing. The notes indicate simply that the government was aware of a CIA project involving Nicaraguan President Somoza in which Wilson was apparently involved. Once again, the notes do not substantiate Wilson's *Brady* claim. Similarly unrevealing, from the *Brady* perspective, is the affidavit of a one M. Gene Wheaton, which states that Wheaton knew someone named Cunningham who was assigned the task of clearing out a CIA "Wilson file."

Finally, in light of the inadequacy of the above enumerated somewhat supposititious bases of Wilson's petition, the district court's denial of Wilson's discovery requests was proper. The requests were far too broad and unspecific. It was reasonable for Judge Williams to conclude that the requested discovery, if granted, would add little or nothing to the proceedings.

The judgment is

AFFIRMED.