<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-2303**

ERIC D. LYNN,

             Plaintiff - Appellee,

       v.

EDWARD TARNEY; RICHARD FALLIN; RUSSELL HAMILL; WILLIAM
WHELAN,

             Defendants - Appellants.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Peter J. Messitte, Senior District
Judge. (8:08-cv-02591-PJM)

Argued:  October 26, 2010          Decided:  December 23, 2010

Before DUNCAN, AGEE, and DAVIS, Circuit Judges.

Reversed by unpublished per curiam opinion.

**ARGUED**: Patricia Prestigiacomo Via, COUNTY ATTORNEY'S OFFICE,
Rockville, Maryland, for Appellants. Terrell Roberts, ROBERTS &
WOOD, Riverdale, Maryland, for Appellee. **ON BRIEF**: Marc P.
Hansen, Acting County Attorney, Edward B. Lattner, Chief,
Division of Human Resources & Appeals, Silvia C. Kinch,
Associate County Attorney, COUNTY ATTORNEY'S OFFICE, Rockville,
Maryland, for Appellants. Christopher A. Griffiths, ROBERTS &
WOOD, Riverdale, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This is an interlocutory appeal from the district court's denial of qualified immunity to four law enforcement officers.

Appellee Eric Lynn was convicted after a non-jury trial in state court of the murder of a drug dealer; the victim was fatally shot in the course of an illegal narcotics transaction that turned into a robbery. The sole state's eyewitness to the murder who testified at trial was a drug addict who had worked for several years as a paid informant in narcotics investigations. The eyewitness/informant had been present in the apartment where the murder occurred and first reported the murder to law enforcement. Lynn's trial counsel knew that the eyewitness was a drug addict and a paid informant and indeed, he knew that she had arranged the very meeting at which the murder occurred.

Lynn's conviction was affirmed on direct appeal, but in post-conviction proceedings, the state courts granted Lynn a new trial, finding that he was deprived of his Sixth Amendment right to the effective assistance of counsel. The deficiency in the performance of defense counsel that prompted the finding of ineffective assistance was counsel's failure to obtain, and employ at trial, an accumulation of impeachment evidence, including evidence that the eyewitness/informant was being paid by investigators for her assistance and cooperation in the

2

murder investigation and not simply for her past assistance in numerous narcotics investigations. Upon the retrial ordered by the state courts, Lynn was represented by successor counsel armed with detailed impeachment evidence, including information concerning the amount and timing of cash payments that had been made to the eyewitness/informant throughout the investigation and prosecution of the murder case. Lynn was acquitted of all charges by a jury.

Proceeding under 42 U.S.C. § 1983 and state law, Lynn sued Appellants, detectives Edward Tarney, Richard Fallin, Russell Hamill and William Whelan of the Montgomery County, Maryland police department, the law enforcement officers who had made (or were aware of) the payments to the eyewitness/informant during the investigation and prosecution of the murder case. Lynn alleged that the detectives' failure to disclose to the prosecutor handling the murder case that the detectives were paying the eyewitness/informant for her assistance and cooperation in the murder case deprived him of his due process right to a fair trial, resulting in his wrongful conviction. Appellants moved for summary judgment on the ground of qualified immunity at the close of discovery; the district court concluded that Appellants were not entitled to qualified immunity.

In this interlocutory appeal from the district court's denial of qualified immunity, we conclude that the fact

3

detectives paid the eyewitness/informant for her assistance in the murder case (and not simply for her assistance in past narcotics investigations) was readily available to Lynn's defense counsel throughout the pretrial period leading up to Lynn's trial. As the state post-conviction court emphatically found, Lynn's counsel simply failed to take the steps he needed to take to obtain information and evidence concerning the payments (and other impeachment evidence). Thus, as a matter of law, Appellants did not violate Lynn's due process right to a fair trial and we, accordingly, reverse the order of the district court.

I.

A.

We set forth the facts in the light most favorable to Lynn. First, however, we state with clarity certain aspects of the summary judgment record that the parties adduced before the district court and now before us. What plainly is not disputed is that, as described within, using governmental funds, detectives made cash payments to the eyewitness/informant on several occasions throughout the investigation and prosecution of the murder case at issue. Nor is it disputed that during the period of the eyewitness/informant's cooperation in the murder case (May through November 1994), she provided no assistance in any narcotics investigations. Nevertheless, all of the

4

Appellants, the assistant state's attorney who originally prosecuted Lynn, and the eyewitness/informant herself, have unwaveringly asserted that the cash payments made to the eyewitness/informant during her assistance and cooperation in the murder case were not in consideration for her assistance and cooperation in the murder case. Rather, Appellants have insisted that the payments were for the eyewitness/informant's prior assistance and cooperation in completed and on-going narcotics investigations (and, perhaps, her future cooperation in such investigations).

Lynn vigorously takes a contrary position. Lynn's analysis of the summary judgment record emphasizes several features of the direct and circumstantial evidence surrounding the payments to the eyewitness/informant: (1) the manner and timing of the payments, which largely coincided with significant investigative activity in the murder case; (2) the lack of any on-going, contemporaneous work by the eyewitness/informant on behalf of the narcotics detectives who were her "handlers" during the pendency of the murder case; and (3) the opaque if not scanty documentary record memorializing the payments. From this mosaic, Lynn makes a more than plausible argument that a reasonable fact finder could conclude that the payments made to the eyewitness/informant during mid- to late 1994 were, at least in

part, in consideration for her continuing assistance and cooperation in the prosecution of Lynn in the murder case.

We agree that in this regard, Lynn has generated a genuine dispute of fact. We thus adopt Lynn's interpretation of the summary judgment record on the issue of whether a reasonable fact finder could find that the payments to the eyewitness/informant during May through November 1994 were in consideration for her assistance and cooperation in the murder case. Nevertheless, as we make clear within, even accepting Lynn's assertion that a reasonable finder of fact could reasonably conclude that the payments were (at least in part) for the eyewitness/informant's assistance and cooperation in the murder case, that fact is not material to the issue of qualified immunity; the outcome of this appeal is the same whether a finder of fact agreed with Appellants or Lynn on this issue.

B.

On May 25, 1994, Montgomery County, Maryland homicide detectives Edward Tarney and Richard Fallin were assigned to investigate the murder of Ephraim Hobson that occurred earlier that day. They learned that their colleague, narcotics detective Russell Hamill, had a confidential informant who had had previous contact with Hobson and who had, in fact, witnessed the murder. Hamill spoke to the informant, Cassandra McRoy, known as "Sandy," who had been a confidential informant for the

6

Montgomery County Police Narcotics Division for more than three years, and arranged her interview by homicide detectives. (Hamill was the detective who worked with Sandy most frequently, although narcotics detective William Whelan also had frequent contact with her.)

Detectives Tarney and Fallin met with Sandy that same afternoon. She told them that she had taken two men to Hobson's apartment to purchase cocaine, and that one of the men had shot Hobson while the two attempted to rob him. She said that she recognized one of the suspects, "Eric," as a local drug dealer whom she had known for about three years. In her description of "Eric," Sandy described a man of considerably different height and weight from the height and weight of Lynn, and she failed to mention any facial hair, although Lynn had distinctive facial hair at the time. Sandy did not know the second suspect.

On the same day as Sandy's interview by the homicide detectives, Tarney and Fallin, detective Hamill, the narcotics detective and one of Sandy's handlers, paid Sandy $140. The internal report documenting the payment described in detail the information she provided to detectives about Hobson's murder, but did not mention any other drug transactions or investigations.

On May 30, 1994, detectives Tarney and Fallin showed Sandy a photo array of offenders named "Eric," from which she made a

7

tentative identification of Lynn. Two days later, on June 1, 1994, detectives displayed to Sandy surveillance photos of Lynn. Then, on June 21, 1994, the detectives took Sandy on a "roving show up procedure" by automobile in Lynn's neighborhood in their continuing attempt to solidify Sandy's identification of Lynn as the "Eric" involved in the Hobson murder. On that day, the detectives paid Sandy $200, $100 of which was paid by one of the homicide investigators and later reimbursed from funds controlled by the narcotics detectives. The internal report documenting the June 21, 1994 activity and related payment stated "synopsis of contact." Detectives arrested Lynn six days later on June 27, 1994, for the murder of Hobson.

In the meantime, on June 17, 1994, the narcotics detectives had requested additional government funds from the Special Investigations Division to be paid to Sandy. This request, for $1250, was described as based on the informant's "previous assistance and . . . continued assistance with the Special Investigations Division." J.A. 675. One thousand dollars was approved by Captain Robert F. McKenna, Director of the Special Investigations Division, on the same day. It is undisputed that the narcotics detectives paid these funds to Sandy in several installments.

On July 22, 1994, Sandy testified before the grand jury. That day she received another payment of $200 for "services

8

rendered." J.A. 678. On September 28, 1994, the detectives took Sandy to meet with the murder case prosecutor to prepare for trial; the detectives paid her $100 "for services rendered in the past." J.A. 681. She was then paid the remaining balance of the June 17 request — a sum of $500 — on December 6, 1994, nine days after she testified at trial against Lynn. The internal report documenting this transaction did not list a reason for the payment.

Lynn was represented in the murder case by David M. Simpson, Esq. In response to Simpson's motion for discovery, the prosecutor provided "open file" discovery beginning some time in June 1994. Simpson was not provided with Sandy's full name, however, or with any information from which he could locate her. Simpson later testified at Lynn's post-conviction hearing that he believed the prosecutor had an obligation to disclose Sandy's identity to him, but he acknowledged that he did not file a motion to compel disclosure of that information. He also testified that he did not believe that prosecutors ever filed a motion to protect or keep confidential Sandy's identity. Instead, Simpson agreed to let the prosecutor set up a meeting between Sandy and himself.

Thus, Simpson and the prosecutor arranged to have Simpson and Sandy meet on the day of a scheduled status conference at the courthouse, a few weeks prior to trial, to permit Simpson to

interview her. Simpson expected that he would learn her identity at this meeting so he could run record checks and further explore her background. He admitted that during these discussions with the prosecutors "it came to [his] attention that [Sandy] was an informant with the police, and . . . she was a paid informant." J.A. 163. Simpson acknowledged that Sandy's status as an informant was significant to him because he recognized that her credibility was the "lynchpin" of the case. J.A. 163.

Remarkably, despite Simpson's acknowledgement of the critical importance of effectively attacking Sandy's credibility in his representation of Lynn in the murder case, Simpson did not meet or speak with her until the day of the trial.[1] The planned meeting between Simpson and Sandy on the day of the status conference did not take place because Sandy failed to appear. Simpson and the prosecutor then arranged for Simpson and Sandy to meet about a week later. That meeting also did not take place, this time because Simpson failed to appear for the meeting. Simpson then spoke to the prosecutor about rescheduling, but they were unable to find a date due to Simpson's "very tight calendar." J.A. 168. Instead, they agreed

---

[1] Indeed, the state post-conviction court noted that "Sandy's testimony was the only piece of evidence that connected [Lynn] to the murder." J.A. 258.

10

that Simpson would speak to Sandy on November 28, 1994, the first day of trial, prior to any proceedings. Despite the fact that Simpson had not interviewed the sole eyewitness whose "testimony was the only piece of evidence that connected [Lynn] to the murder," J.A. 258, he did not file any motions to compel disclosure of her identity or any other information about her, nor did he ask the prosecutor for any additional information. At no time did he seek a postponement of the trial.

On the day of trial, Sandy did not arrive on time for the meeting with Simpson. Indeed, she was a reluctant witness and only arrived after detectives arranged to locate her and bring her into court. Despite the fact that he was again unable to speak with Sandy, Simpson did not ask for a postponement or continuance. Instead, he decided that he would simply proceed with a pretrial motions hearing without speaking to Sandy beforehand. During the hearing, Simpson questioned Sandy about her status as a paid informant. She testified that she had been a paid informant for Detective Hamill for over three years. When Simpson asked her whether she had been paid for her cooperation in the murder case, she answered no. Simpson asked no further questions regarding her status as a paid informant or the cases she had worked on. Despite his admitted knowledge of the importance of Sandy's credibility, and the fact that he now knew, as well (from her testimony at the suppression hearing)

11

that Sandy worked as a paid informant for law enforcement while also collecting fees from drug dealers for arranging drug transactions, Simpson determined that he did not need to speak to Sandy any further after the motions hearing and before the trial. He then proceeded directly to trial without asking for a postponement, continuance, or any additional information regarding Sandy, her history with law enforcement, or the amount, timing, or reasons for the payments made to her.

At the hearing on Lynn's post-conviction petition in 2000, Simpson testified as follows, in part, about his thinking and decision-making in connection with his representation of Lynn:

> A: . . . I would have liked to talk to her, but since she was there for the motion, I was going to at least do the motion first and then get into, if I needed to talk to her more before we actually started the trial. But once we got done with the suppression hearing, I didn't need to talk to her anymore.
>
> Q: That was the determination you made?
>
> A: Absolutely.
>
> Q: Based on what you got from her out of the suppression?
>
> A: Absolutely.
>
> Q: Now the suppression for her only revolved around her identification [of Lynn as a participant in the murder].
>
> A: That's right.
>
> . . .

12

Q: Did you receive any information from the State's Attorney about her during the hearing?

A: Not that I recall.

. . .

Q: Now, either before, during or after the suppression motion, <u>did you bring to Judge Ruben's attention that you had this informal agreement to resolve discovery about her, that you had had that informal agreement that it not take place?</u>

A: After the motion?

Q: Or during it or before.

A: <u>No.</u> We didn't have any – I didn't, <u>I didn't think it was necessary at that point.</u>

Q: Okay. So you never brought it to Judge Ruben's attention?

A: No.

Q: <u>And did you ever ask for any relief before, during or after that hearing of the judge regarding discovery concerning Sandy?</u>

A: <u>No.</u> I didn't ask for anymore [sic].

Q: And at that hearing, did you ever learn her true name?

A: Not that – no. I don't – no.

J.A. 170-72 (emphases and alterations added).

The state's case at trial, which was to the court without a jury,[2] consisted of the testimony of four law enforcement

_____

[2] Simpson testified at the state post-conviction hearing that based on his knowledge of the veteran trial judge's background in criminal cases, and the judge's seeming skepticism

13

officers, a firearms investigator, and Sandy. Sandy testified that on May 25, 1994, she took Lynn and another man to Hobson's apartment to purchase drugs. While Hobson was preparing the drugs for purchase, Lynn's companion pulled a gun, pointed it at Hobson and demanded money. Hobson pulled a gun and shots were fired. On cross examination, Simpson's inquiry into Sandy's work as an informant was limited to a question regarding whether she was a paid informant, and for how long she had been one. Simpson asked her no questions about the specifics of the payments made to her during the course of the homicide investigation. Lynn was convicted the following day and subsequently sentenced to a total period of incarceration of life plus five years.

C.

After exhausting his direct appeal, Lynn filed a petition for post-conviction relief in state court. On August 18, 2000, the Circuit Court for Montgomery County granted post-conviction relief, finding that Lynn was denied his Sixth Amendment right to the effective assistance of counsel based on Simpson's inadequate investigation of Sandy's background. On the state's appeal, the Court of Special Appeals of Maryland agreed that Simpson's failure to investigate Sandy's background constituted

_____

at Sandy's testimony at the suppression hearing (e.g., according to Simpson, she appeared to be under the influence of drugs), he recommended to Lynn and Lynn acceded to his recommendation that jury trial be waived.

14

deficient performance under <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984), but determined that Lynn had not established the second prong of a <u>Strickland</u> claim, i.e., prejudice, because there was no showing that any additional significant impeachment material against Sandy existed. <u>See</u> <u>id</u>. The appellate court remanded the case for further proceedings and directed the post-conviction court to permit discovery.

During the post-remand proceedings, counsel for Lynn conducted extensive discovery and the state turned over Sandy's confidential informant file and control log, among other documents. The file revealed the specific dates and amounts of the payments made to Sandy during the course of the homicide investigation and prosecution. In light of the evidence produced by Lynn after the remand, the circuit court determined that Lynn had demonstrated <u>Strickland</u> prejudice.[3] Accordingly, the court

---

[3] Importantly, and contrary to Lynn's seeming suggestion both before the district court and on appeal before us, the state post-conviction court did not conclude that it was the mere non-disclosure of the timing of the payments to Sandy that prejudiced Lynn's right to effective assistance of counsel. Rather, the post-conviction court concluded that it was <u>an accumulation</u> of undiscovered additional impeachment evidence that prejudiced Lynn's Sixth Amendment right. <u>See</u> J.A. 290-97 (setting forth post-conviction court's findings that <u>Strickland</u> prejudice arose from the following: (1) Simpson's failure to uncover a second theft conviction imposed on Sandy; (2) his failure to uncover the fact that at the time of the first trial, an arrest warrant for Sandy for violation of probation was outstanding; (3) his failure to uncover the extent of Sandy's drug addiction, including her admission for in-patient substance

15

again granted Lynn's petition, vacated his conviction, and ordered a new trial. Upon the state's appeal from the grant of post-conviction relief, the Court of Special Appeals affirmed the order of the post-conviction court.

The state elected to retry Lynn. Lynn's second trial began on October 24, 2007, this time before a jury. Evidence of the specific payments made to Sandy was introduced by Lynn's new lawyer (together with the raft of other impeaching evidence). Lynn was acquitted by the jury of all charges.

## II.

This § 1983 damages action was timely removed to federal district court from the Circuit Court for Prince George's County on October 3, 2008. On December 5, 2008, the district court issued an order dismissing all counts of the complaint except Lynn's claim for deprivation of due process against Appellants, detectives Tarney, Fallin, Hamill and Whelan. At the conclusion of discovery, the detectives filed a motion for summary judgment on the sole remaining count, asserting that they did not violate

---

abuse treatment a mere four months before the May 1994 murder; and finally, (4) his failure to uncover the specific timing of the cash payments to Sandy during the pendency of the murder case, about which the court stated: "[W]hether it could be reasonably inferred that certain payments were recompense for assistance and cooperation in the homicide case was a proper impeachment issue.").

Lynn's due process right to a fair trial and that they were entitled to qualified immunity. At a hearing on October 20, 2009, the district court ruled from the bench that a jury could find that the detectives had willfully and maliciously withheld evidence from Lynn, and that a reasonable law enforcement officer would have known that doing so was against the law. Consequently, the district court concluded that the detectives were not entitled to summary judgment.

### III.

In this timely interlocutory appeal, over which we have jurisdiction pursuant to 28 U.S.C. § 1291, we review solely legal issues, see Mitchell v. Forsyth, 472 U.S. 511, 529 n.9 (1985); Johnson v. Jones, 515 U.S. 304, 313 (1995), applying a de novo standard, see, e.g., Johnson v. Caudhill, 475 F.3d 645, 650 (4th Cir. 2007). Whether an asserted factual dispute is material to qualified immunity is also a legal determination subject to de novo review. See, e.g., Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996).

When evaluating a claim of qualified immunity, courts consider two questions: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether the right was clearly established. Saucier v. Katz, 533

17

U.S. 194, 200-01 (2001). These questions may be considered in the order most appropriate for the specific case. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

"Qualified immunity does not override the ordinary rules applicable to summary judgment proceedings, nor does it give special substantive favor to the defense." Henry v. Purnell, 619 F.3d 323, 333 (4th Cir. 2010) (internal quotations omitted), pet. for rehearing en banc pend. However, Lynn still bears the burden of projecting evidence from which a jury could reasonably conclude that the detectives violated his right to due process. Cf. Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006) ("[T]he burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

IV.

A.

We conclude that this case properly may be disposed of at the first step of the Saucier analysis, that is, on the issue of whether Lynn has projected sufficient probative evidence which, if believed by the fact finder, would establish that Appellants deprived him of his due process right to a fair trial. We indulge several assumptions favorable to Lynn. First, we assume that the outcome of Lynn's second trial, acquittal on all counts, resulted in whole or in part from his new counsel's use of the evidence showing the specific dates the detectives made cash payments to Sandy. Second, we assume that if the detectives had volunteered to the murder case prosecutor, and if that prosecutor had volunteered to Simpson that, by the time of the first trial (in November 1994), Sandy had received the specific cash payments delivered to her on May 25, 1994 (the date of the murder), and thereafter on specific dates in June, July, and September 1994, then the trial judge who conducted the non-jury trial would likely have harbored a deeper skepticism as to the reliability of Sandy's identification of Lynn as a participant in the robbery/murder of Hobson and, consequently, would likely have harbored a reasonable doubt as to Lynn's guilt. Finally, we assume, as mentioned earlier, that a reasonable fact finder could reasonably conclude that the cash payments the detectives

19

made to Sandy from on and after the date of the murder to the date of the trial were, in whole or in part, for her assistance and cooperation in the murder investigation, and not merely in consideration for her assistance and cooperation in drug investigations. Ultimately, none of these assumptions salvages Lynn's claim.

B.

The Fourteenth Amendment prohibits states from depriving any person of her liberty without first affording her "due process of law" by means of a fair trial.[4] Cone v. Bell, 129 S.

---

[4] We note that Lynn has insisted that his claim arises directly under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. As we describe in the text, the duty imposed by the Brady doctrine is an obligation on prosecutors, rooted in the due process clauses of the Fifth and Fourteenth Amendments, to disclose exculpatory evidence (including impeachment evidence). See id. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.") (emphasis added); Kyles v. Whitley, 514 U.S. 419, 437 (1995) (noting that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Semantics aside, it is clear that, in essence, where a law enforcement officer "suppresses" favorable evidence such that the prosecutor fails to learn of it, a violation of the Brady doctrine by the prosecutor results.

This court's jurisprudence in respect to the cognizability of Brady-type claims against law enforcement officers remains in a state of uncertainty. Compare Jean v. Collins, 221 F.3d 656, 658-63 (4th Cir. 2000) (Wilkinson, J., concurring in the denial of rehearing en banc by an equally divided en banc court) with id. at 663-77 (Murnaghan, J., dissenting from the denial of rehearing en banc by an equally divided en banc court). This

20

Ct. 1769, 1772 (2009). In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "when a State suppresses evidence favorable to an accused that is material to guilt or to punishment, the State violates the defendant's right to due process, 'irrespective of the good faith or bad faith of the prosecution.'" Cone, 129 S. Ct. at 1772 (quoting Brady, 373 U.S. at 87); see also United States v. Jeffers, 570 F.3d 557, 573 (4th Cir. 2009); United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990). The Court's opinion in Giglio v. United States, 405 U.S. 150, 154-55 (1972), extended the Brady doctrine to impeachment evidence.

It is plain, however, that no due process violation is made out if the allegedly withheld or suppressed evidence was readily available to the defense. See Wilson, 901 F.2d at 381 ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine."); see also Hoke v. Netherland, 92 F.3d 1350, 1355 (4th Cir. 1996).

Here, we conclude as a matter of law that Lynn has not satisfied his burden of projecting evidence from which a jury

case provides no necessity and thus no opportunity to clarify that uncertainty, however, inasmuch as we conclude that under no potentially applicable standard would a Brady-type damages claim be made out by Lynn against Appellants.

21

could reasonably conclude that the detectives denied Lynn his due process right to a fair trial. Evidence of the detectives' cash payments to Sandy between the date of the murder and the commencement of trial was readily available to Simpson before trial.[5]

The state agreed to make Sandy available to Simpson for an interview several weeks before trial. Although Sandy failed to appear for the first scheduled meeting, Simpson himself then cancelled a subsequent meeting and failed to reschedule any subsequent meeting, citing his busy schedule.

Simpson then agreed to delay his interview of Sandy until immediately prior to the suppression hearing on the first day of trial. Then, when Sandy arrived late for the scheduled interview, Simpson did not file any motions for disclosure or request a continuance or postponement. Instead, he determined he could simply question Sandy on the stand during the hearing. At the hearing, Sandy admitted she was a paid informant, but Simpson did not ask Sandy anything about the payments she had

---

[5] The finding of the state post-conviction court is wholly unambiguous:

> This Court concludes that the duty to investigate in this case was breached, not only because of [the expert opinion testimony introduced by Lynn], but because common sense dictates that investigation of the sole witness in a first degree murder case is required.

J.A. 261.

22

received or the cases she worked on for the police. Nor did he examine detective Hamill about the types of cases for which Sandy was paid, when the payments were made, or how much the payments were. Then, after the hearing, Simpson elected to proceed directly to a non-jury trial without requesting any further discovery or information about Sandy, apparently hoping he had accurately read the presiding judge's non-verbal intimations that Sandy would be disbelieved. See supra p. 13 n.2. He never filed any motion to compel disclosure of Sandy's identity, and in fact he never learned her actual identity. Nor did he request documentation of the payments made to Sandy, despite his appreciation that her credibility was the "lynchpin" of Lynn's case. J.A. 163. He recommended, and Lynn agreed to, a non-jury trial.

In light of these facts, it is indisputably clear that Lynn was denied the effective assistance of counsel in consequence of Simpson's failure to conduct anything close to a reasonable investigation in the murder case. Nevertheless, these facts do not remotely suggest that the detectives' acts and omissions denied Lynn his right to a fair trial. Indeed, as the post conviction court concluded, it was the accumulation of undiscovered additional impeachment evidence (including a second theft conviction; the outstanding arrest warrant for Sandy for violation of probation; and Sandy's extensive drug use) that

23

combined with Simpson's failure to uncover the timing of the cash payments during the pendency of the murder case that deprived Lynn of substantial justice. In short, Lynn has only projected evidence sufficient to show that his Sixth Amendment right was compromised by Simpson's deficient performance in failing to uncover information that was both available to him and in a source where it would have been uncovered by <u>any</u> reasonably competent lawyer.[6] <u>Hoke</u>, 92 F.3d at 1355 (finding no due process violation where the defendant's lawyer had access to all of the allegedly withheld witnesses and would have learned of them had he undertaken a reasonable investigation); <u>Wilson</u>, 901 F.2d at 381 (denying relief where defense counsel could have obtained the exculpatory information by questioning a witness in preparation for trial); <u>Lugo v. Munoz</u>, 682 F.2d 7, 9-10 (1st Cir. 1982) (where facts are available to a diligent defense attorney, no due process violation can be established)(cited with approval in <u>Wilson</u>, 901 F.2d at 380.).

---

[6] Of course, our holding does not mean that a criminal defendant cannot suffer the denial of a fair trial on two or more distinct bases. We hold only that on the record before us, as a matter of law, it was a Sixth Amendment deprivation, not a Fourteenth Amendment deprivation, that inflicted injury, if any, on Lynn.

24

V.

In this § 1983 damages action, Lynn has failed to satisfy his burden at the summary judgment stage to project evidence from which a jury could conclude that Appellants violated his due process right to a fair trial. Instead, he has only projected evidence from which a jury could reasonably find that his defense attorney probably committed professional malpractice under state law. As he has failed to support his assertion that Appellants violated his right to a fair trial, summary judgment on the ground of qualified immunity should have been granted. See Saucier, 533 U.S. at 200-01. Accordingly, the order of the district court is

REVERSED.