**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-2095**

---

JEROME L. JOHNSON,

       Plaintiff – Appellant,

   v.

BALTIMORE POLICE DEPARTMENT; KEVIN DAVIS; FRANK BARLOW; DANIEL BOONE; GERALD GOLDSTEIN,

       Defendants – Appellees.

---

**No. 22-2134**

---

JEROME L. JOHNSON,

       Plaintiff – Appellee,

   v.

BALTIMORE POLICE DEPARTMENT; KEVIN DAVIS; FRANK BARLOW; DANIEL BOONE; GERALD GOLDSTEIN,

       Defendants – Appellants.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. Ellen Lipton Hollander, Senior District Judge.  (1:19-cv-00698-ELH)

---

Argued:  December 5, 2023                        Decided:  March 21, 2024

Before AGEE, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

_____

Judgment in No. 22-2095 affirmed and appeal in No. 22-2134 dismissed by unpublished opinion. Judge Quattlebaum wrote the opinion in which Judge Agee and Judge Benjamin join.

_____

**ARGUED:** Kobie Alan Flowers, BROWN GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellant/Cross-Appellee. Michael Patrick Redmond, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:** Andrew D. Freeman, Neel K. Lalchandani, BROWN GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellant/Cross-Appellee. Ebony M. Thompson, Acting City Solicitor, Kara K. Lynch, Chief Solicitor, Michael Redmond, Director, Appellate Practice Group, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellees/Cross-Appellants.

_____

Unpublished opinions are not binding precedent in this circuit.

QUATTLEBAUM, Circuit Judge:

Roughly thirty-five years ago, a Baltimore jury convicted Jerome "Lamont" Johnson and two others for the July 14, 1988 murder of Aaron Taylor. Johnson was sentenced to life for first degree murder plus a twenty-year consecutive sentence for use of a handgun in the commission of a crime of violence. Some thirty years later, the Baltimore City State's Attorney's Office and Johnson jointly petitioned for a writ of actual innocence. The Circuit Court for Baltimore City granted that petition, vacating Johnson's convictions. Johnson then sued the Baltimore Police Department and several investigating officers under 42 U.S.C. § 1983, alleging that due to the officers' failure to disclose exculpatory evidence and other actions, he served several decades in prison for a crime he did not commit.

After discovery, the police officers and the police department moved to dismiss Johnson's complaint as a litigation sanction, alleging he knowingly used false and fabricated evidence to secure his exoneration and intentionally tampered with potential witnesses to influence their testimony in connection with efforts to vacate his convictions. They also moved for summary judgment on the merits of Johnson's § 1983 and related claims. In a comprehensive order, the district court granted the sanction motion dismissing the complaint, and, alternatively, granted the motion for summary judgment on all pending counts. Johnson timely appealed and the officers and police department cross-appealed, asking us to remand for the district court to consider and award attorneys' fees. For the reasons stated below, we affirm the district court's well-reasoned order granting summary

3

judgment for the officers and the police department on the merits. We dismiss the officers' and police department's cross-appeal seeking a limited remand.

## I.[1]

Just after 1:00 a.m. on July 14, 1988, a group of men approached Taylor on a basketball court. An argument ensued. Taylor fled into the nearby Night Owl Tavern, a neighborhood bar and store. One of the men on the basketball court—Alvin Hill, also known as "Poopie"—and several others from the basketball court followed him into the bar. While inside, Hill fatally shot Taylor with a handgun.

The first two Baltimore Police Department officers on the scene were Robert Mays and Kenneth Jones. Homicide detective Kevin Davis arrived later. At the scene, Officer Jones and Detective Davis encountered Lakeisha Snead, Taylor's 15-year-old cousin and a key witness to the crime. The information Snead provided to the police officers at various times and her testimony to the grand jury and at trial are central to Johnson's claims. So, we describe that information and testimony in some detail.

In an affidavit signed in 2021, over 30 years after the murder, Officer Jones said he interviewed Snead the night of the incident. He said the interview took place not at the scene, but at police headquarters. In his affidavit, Officer Jones said, after the interview, he

---

[1] The complete facts and procedural history are extensive and thoroughly set forth in the district court's order. We describe the portions of those facts and procedural history necessary for this opinion.

left Snead at police headquarters and told a member of the department, who he thought was a detective, that Snead was at the homicide unit.

Although he said he did not take any notes during Snead's interview, Officer Jones said that he memorialized the interview in a handwritten "supplemental report." J.A. 787. That report, dated "14 Jul 88," indicates that Snead said she was present in the bar with Taylor. J.A. 938. According to the report, Snead said four men came into the bar. One pulled a black and brown gun from his waistband and held it down to the floor. She said Taylor grabbed a bar patron and used him as a human shield. Eventually, that patron freed himself and fled, leaving her cousin to face the man with the gun. According to the report, Snead "then ran out and heard 5 shots," and the three men who came into the bar with the man holding the gun also fled. J.A. 938. Snead described the physical appearance of the man holding the gun but indicated that she did not know his name. She indicated, however, that she had seen him in the area. She also said she knew the names of two of the other men but did not want to give Officer Jones that information because she feared for her life.

Detective Davis also prepared a typed report on July 14, 1988. The report says Officer Jones interviewed Snead but does not say where that interview took place. It also describes Snead as "extremely excited." J.A. 746. According to the report, and potentially in conflict with Officer Jones' handwritten report, Snead said she was in the bar when Taylor was shot. The report indicates that the "witness will be interviewed by Homicide Investigators as soon as possible." J.A. 746.

Detective Davis' records also include a piece of paper with his handwritten notes. These notes document several events related to the investigation on various dates. Under

5

July 14, 1988, one note appears to read, "Lakisha – upset briefly interviewed at scene, released," J.A. 1069, which is seemingly inconsistent with Officer Jones' affidavit, J.A. 1069.

Other handwritten notes from Detective Davis indicate that he interviewed Snead on July 19, 1988. These notes provide more detailed information about what Snead purportedly did and saw on July 14. Presumably from information provided by Snead, the notes indicate that Taylor told Snead's mother he was going to the store to get snacks. Snead followed a minute later with a friend and her mother's friend. In a list of five suspects, the notes identify "Lamont" as someone who "had a little gun gave it to Poopie." J.A. 1076. The notes also document that "Lamont gave Poopie a small gun at the crack in [the] fence, Poopie shot at V gun clicked 2 times, V ran into store, [Snead] ran in with her mother's friend . . . ." J.A. 1076–77. The notes indicate that Snead heard four shots and that she was in the store at the time of the shooting.

From his handwritten notes, Detective Davis prepared another typed report, this one dated July 19, the date he interviewed Snead. That report recounts Snead's statement that she observed a man named "Lamont" give Poopie a small handgun outside of the Night Owl and that Poopie pointed the handgun at Taylor but it did not fire. It indicates that Snead followed Taylor into the store, where she saw Poopie holding a large black handgun and heard a man she knew as "Buttons"—Buttons' real name is Reginald Dorsey—tell Poopie to shoot. The report contains the names and physical descriptions of four of five suspects, including "Lamont," that Snead provided. While Detective Davis' notes indicate that Snead

6

went to the Night Owl with a friend and her mother's friend, the report does not mention whether anyone went with Snead.

Less than two weeks later, on July 28, 1988, Snead testified before the grand jury. She testified that she was with Taylor, her friend and her mother's friend around 1:00 am at a home near the Night Owl. J.A. 1083–84. She said that, after Taylor left to go to the Night Owl, she followed about five minutes later. She testified that, when she approached the Night Owl, she saw Johnson—whom she called "Lamont"—give Hill—whom she called "Poopie"—a gun that misfired when Hill pointed it at Taylor. She said she went inside the bar, where Taylor had fled, and saw Hill with a different, larger gun with a brown handle. Snead testified that she then ran out of the store and heard four gunshots.

Referencing statements from witnesses, Detective Davis secured a warrant for Johnson's arrest for his role in Taylor's murder. Johnson was later arrested, indicted and tried with several co-defendants by a Baltimore City Circuit Court jury.

At the 1989 trial, Snead testified that she went to the Night Owl to get chips with her friend and her mother's friend. She said she saw Taylor, her cousin, in front of the Night Owl near the basketball court talking to Hill. She said she also saw Johnson, Reginald "Buttons" Dorsey, Thomas "Tommy" Carroll, and another man she did not know with Taylor and Hill. She positively identified Johnson and his co-defendants Hill, Dorsey and Carroll in court. "They was standing there talking, and as we was walking in the bar, my cousin ran in the store and Poopie pulled out a gun, got it from behind his back." J.A. 526. She testified that Johnson was there when the handgun that Hill aimed at Taylor misfired, and that Johnson handed him another gun that Johnson retrieved from his pants.

7

The jury found Johnson, Hill and Dorsey guilty of murdering Taylor. It found Carroll not guilty. After being convicted, Johnson was sentenced to life for first degree murder plus a twenty-year consecutive sentence for using a handgun while committing a crime of violence.

Johnson unsuccessfully challenged his conviction on direct appeal. He was also denied post-conviction relief. Some years later, in 1997, Johnson sought additional post-conviction relief, this time arguing that newly discovered evidence, testimony of two witnesses, established Johnson's actual innocence. In an affidavit, Paul Burton[2] testified that sometime after midnight on July 14, 1988, Burton was involved in a minor traffic accident with another vehicle near the murder scene. He said that he saw a friend, "Aaron," whose last name he did not know, involved in an argument at a nearby basketball court with "four or five men and a female [he] did not know." J.A. 1247. He said he walked up to Aaron to ask what was going on when a light-skinned man he heard Aaron call "Poopie" pulled out a gun and pointed it at Aaron. Aaron purportedly hit the gun out of Poopie's hand, and Burton picked it up and handed it back to Poopie. Burton said that Aaron then started running, and the men with whom he had been arguing chased after him. Burton said that he learned the next day that Aaron had been shot. Burton testified that at the time of the incident, he did not know Johnson, although he stated that "Johnson was not present

---

[2] Johnson also submitted an affidavit from Alvin Morgan. Morgan stated that he was with Johnson in the early morning hours near the scene of the murder. Morgan said he saw men running after a man he did not know in the direction of a nearby bar. Morgan said after he heard four or five popping sounds, he talked Johnson out of going toward the bar to find out what was going on.

during the incident described." J.A. 1248. He said he met Johnson while they were serving their prison sentences, explaining, "I felt bad, because I knew that he was not involved, and that in fact I was the person who had handed 'Poopie' a gun (which he had dropped) during the incident." J.A. 1248.

It turns out this affidavit was false. Although Burton did meet Johnson while in prison, Burton was in prison for an unrelated crime on July 14, 1988. So, he could not have been in a car accident near the scene or have handed off the gun. Concluding that the new facts raised in the petition failed to exonerate him, the state court denied Johnson's request for post-conviction relief.

But he persisted. In seeking leave to file a successive petition to our Court in 2000 after an initial effort was denied in 1995, Johnson added another affidavit, this time from Hill—the man who shot Taylor and who was in prison for that crime. That affidavit repeated the same story of Taylor knocking the gun out of Hill's hands and Burton, a man Hill concedes he did not know at the time, handing it back to him. Hill said that Johnson was not present during that incident. We denied this petition. Undeterred, in 2012, Johnson petitioned the Circuit Court for Baltimore City for a writ of actual innocence. That effort also failed.

Eventually, however, Johnson's fortunes turned. Using the Hill affidavit—which to repeat, mirrored the Burton affidavit—as well as other evidence, the Baltimore City State's Attorney and Johnson jointly petitioned for a writ of actual innocence. In July 2018, the Circuit Court for Baltimore City granted the joint petition and vacated Johnson's

9

convictions. The court awarded Johnson a new trial, but the state entered a nolle prosequi on each count of the indictment, leading to the dismissal of all charges.

II.

Following the vacatur of his convictions, Johnson filed the underlying lawsuit in 2019 in federal district court. And, in an amended complaint, he asserted against the officer defendants § 1983 claims for failure to disclose exculpatory and impeachment evidence, fabrication of evidence, malicious prosecution and failure to intervene, as well as claims under Maryland law for malicious prosecution and intentional infliction of emotional distress. He also asserted a *Monell*[3] claim against the Baltimore Police Department. J.A. 54.

After discovery, the officers and the police department moved to dismiss the entire case and for reimbursement of fees as a litigation sanction, alleging Johnson used the Burton and Hill affidavits to secure his exoneration and influenced the testimony of at least

---

[3] *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658 (1978).

three potential witnesses.[4] They also moved for summary judgment on all claims.[5] The district court, in a 153-page opinion, dismissed the case as a litigation sanction but denied the request for fees. In an abundance of caution, the court considered the summary judgment motions and in the alternative to dismissing the case as a litigation sanction, granted the motions for summary judgment on all counts. Johnson timely appealed the dismissal of his claims, and the defendants cross-appealed the denial of their request for attorneys' fees.

---

[4] First, Johnson suggested to a friend and accomplice that they show Snead's friend some "love" for stepping up with favorable testimony. S.A. 73. Second, Johnson sent Carroll money and offered to pay for his lawyer. Third, in a phone call with Dorsey recorded on January 18, 2020, Johnson said:

> What we got right now, Butt, is that **what you told me about they told you about that statement. Yo, you can't never say that.** I'm going to tell you why. Yo, listen to what I'm saying, because the way my case, the reason I'm out of prison, and **the reason I got a $ 60 million lawsuit against the police**, is because we saying they withheld that statement. Now, if you saying they said something to you about it when they got – when you got locked up, right, but I'm telling you, **don't say nothing about that**, yo, in this case right now.

J.A. 2105 (emphasis added).

[5] Johnson did not oppose summary judgment on the fabrication count. And he requested that one of the officer defendants, Frank Barlow, be dismissed. That grant of summary judgment and dismissal are not subjects of these appeals.

11

III.

In considering these appeals, we affirm the district court's alternative holding[6] granting the officer defendants and the police department summary judgment on the merits.[7]

Johnson argues that the officer defendants failed to turn over Officer Jones' July 14, 1988 report and Detective Davis' July 19, 1988 notes and his report of that same date. According to Johnson, by withholding this information, the officers violated his Fifth and Fourteenth Amendment due process rights by defying *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that the government's suppression of "material exculpatory evidence," which has a reasonable probability of producing a different outcome, violates the due process clause. *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019). To prove a § 1983 claim against police officers based on a *Brady* violation, the plaintiff must demonstrate and ultimately prove that: "(1) the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396–97 (4th Cir. 2014) (footnote omitted). Police officers, unlike prosecutors, commit constitutional violations only when they suppress exculpatory evidence in bad faith. *Id.* at 396 n.6.

---

[6] In affirming on the alternative ground, we of course, do not condone witness tampering or using false evidence. But in these appeals, we need not determine whether dismissal of this action was an appropriate sanction.

[7] Appellate review of summary judgment decisions is de novo. *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *French v. Assurance Co. of Am.*, 448 F.3d 693, 700 (4th Cir. 2006).

12

The parties first disputed whether the information was withheld. The prosecutor said it would have been his practice to turn over the Jones report, but it is not clear from his file that was done, especially since Officer Jones was not called to testify at trial. As for the Davis report and notes, the prosecutor said those documents were in his file and that defense counsel had access to them. Giving Johnson the benefit of the doubt, the district court assumed these documents were not produced prior to trial.

The parties also dispute the materiality of this information. For his part, Johnson contends the evidence is exculpatory and would have provided valuable impeachment information. Johnson points out that the Jones report, written on the date of the murder, does not mention his name or indicate that anyone was with Snead. And he adds that while the Davis notes mention that Snead said she was with two other people, the Davis report does not contain that information. But the district court agreed with the prosecutor that none of this evidence was material nor was it exculpatory. True, the Jones report does not identify Johnson. But the district court pointed out that it does not identify anyone by name. So, the court found it did not reveal any lack of consistency with respect to Snead's statements. The report just captures Snead's unwillingness to identify any one at that time. And similarly, while the Jones report does not indicate that Snead said she was with others at the Night Owl, the district court explained that there is no indication that Snead was asked a question that would have elicited that response. In fact, the court reasoned that the Davis notes' identification of others being with Snead suggests the opposite is true—when asked by Detective Davis, Snead responded that others were with her. According to the court, the Davis report and Jones report were not inconsistent or exculpatory evidence; they

13

were just less complete documents. What's more, the district court explained that Johnson had complete access to all this information from Snead's grand jury testimony. *See United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (noting that the *Brady* Rule does not apply if the evidence is available to the defendant from other sources or the defendant knew or should have known of the facts permitting him to take advantage of exculpatory evidence).

The district court also found no bad faith on the part of the officers, either by their actions or with respect to potential deviation from police policies. It concluded that there was no evidence the officers fabricated evidence; that the Davis notes indicated that Officer Jones interviewed Snead, so there was no evidence that the officers tried to cover up the Jones report; and that the mother of Snead's friend whom Snead said accompanied her to the Night Owl did not permit her daughter to speak with the officers. That means that the officers had no more information than Johnson had about that potential witness.

In its comprehensive analysis, the district court carefully considered Johnson's claims and arguments. The court correctly applied the applicable law to those claims. We see no reversible error in the court's order granting summary judgment on the § 1983 claims.[8]

---

[8] Johnson also alleged that the officers failed to disclose a non-identification of Johnson in a photo array. But as the district court concluded, the record contained no evidence of a known non-identification. The court credited Johnson with demonstrating that the documented use of photos was sloppy but properly rejected Johnson's speculative assumption that he must have been in a photo array and that the witnesses failed to identify him. And the court rejected Johnson's allegation that some other interview of Snead by a detective occurred and was suppressed, finding the allegation unsupported by the record.

We also affirm the district court's rulings with respect to the remaining causes of action. Johnson's federal and state law claims for malicious prosecution, what is properly understood as a claim for unreasonable seizure, fail. *See Hupp v. Cook*, 931 F.3d 307, 323–24 (4th Cir. 2019); *Caldor, Inc. v. Bowden*, 625 A.2d 959, 970 (Md. 1993). The record evidence, including the underlying criminal investigation and witness statements known to Detective Davis, shows that there was ample probable cause for Johnson's arrest. *See Cahaly v. Larosa*, 796 F.3d 399, 407–08 (4th Cir. 2015) (noting that probable cause to justify an arrest means the facts and circumstances within the officer's knowledge sufficient to warn a prudent person that the suspect had committed an offense). Next, because Johnson fails to establish an underlying constitutional violation, his § 1983 failure to intervene claim and state law intentional infliction of emotional distress claims necessarily fail. *See Randall v. Prince George's Cnty.*, 302 F.3d 188, 202–03 (4th Cir. 2002); *Caldor, Inc.*, 625 A.2d at 963 (setting forth elements of state law IIED claim). Finally, we affirm the district court's dismissal of Johnson's *Monell* claim. Because municipal liability under § 1983 cannot be predicated solely upon a respondeat superior theory, liability arises only where constitutionally offensive acts of city employees are taken in furtherance of municipal policy or custom. *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). "[A] municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (cleaned up). Johnson's *Monell* claim fails without "a predicate constitutional violation to proceed." *See Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012).

15

IV.

For the foregoing reasons, we affirm the district court's judgment in No. 22-2095.

We grant no appellate relief to the officers and the police department on their cross-appeal

and dismiss the appeal in No. 22-2134.

*SO ORDERED*